# IN THE SUPREME COURT OF IOWA

No. 15–0943

Filed June 1, 2018

**SHARI KINSETH** and **RICKY KINSETH,** Coexecutors of the Estate of Larry Kinseth, Deceased, and **SHARI KINSETH,** Individually,

    Appellees,

vs.

**WEIL-McLAIN,**

    Appellant,

and

**STATE OF IOWA** ex rel. **CIVIL REPARATIONS TRUST FUND,**
    Intervenor-Appellee.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Wright County, Stephen P. Carroll, Judge.

Estate that prevailed at trial seeks further review of a court of appeals decision ordering a new trial based on attorney misconduct during closing arguments. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND REVERSED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR NEW TRIAL WITH INSTRUCTIONS.**

Richard C. Godfrey, P.C., Scott W. Fowkes, P.C., Howard M. Kaplan and Ryan J. Moorman of Kirkland & Ellis LLP, Chicago, Illinois; William R. Hughes Jr. and Robert M. Livingston of Stuart Tinley Law

Firm, LLP, Council Bluffs; and Edward J. McCambridge and Jason P. Eckerly of Segal McCambridge Singer & Mahoney, Chicago, Illinois, for appellant.

Misty A. Farris, Lisa W. Shirley, David C. Greenstone, Jay E. Stuemke, and Kevin W. Paul of Simon Greenstone Panatier Bartlett, PC, Dallas, Texas; and James H. Cook of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for appellees.

Thomas J. Miller, Attorney General, and Richard E. Mull, Assistant Attorney General, for intervenor-appellee.

**CADY, Chief Justice.**

In this case, we are called upon to review numerous issues that arose during litigation between the estate of Larry Kinseth, who passed away from mesothelioma, and Weil-McLain, a boiler manufacturer whose products exposed Kinseth to asbestos. After several pretrial rulings and a nearly four-week trial, the jury awarded the estate $4 million in compensatory damages and $2.5 million in punitive damages. Weil-McLain subsequently filed a motion for a new trial and a motion for judgment notwithstanding the verdict. The district court denied both motions and Weil-McLain appealed. We transferred the case to the court of appeals, and the court reversed. For the reasons set forth below, we remand the case for a new trial.

## I. Factual Background and Proceedings.

Larry Kinseth was born in 1939 in Belmond, Iowa. He was the youngest of eight children, and his oldest brother, Kenny, served in World War II. In 1953, when Kinseth was fourteen years old, he began working for Kenny's business, Kinseth Plumbing and Heating. During the school year, he worked ten hours every Saturday, and during the summers, he worked sixty-hour weeks. Kinseth helped the various crews install boilers, chimneys, and hot air furnaces. In 1957, Kinseth graduated from high school and began working for Kinseth Plumbing and Heating full time. He joined the installation crew, which primarily installed commercial and residential boilers and furnaces.

Kinseth Plumbing and Heating sold and installed boilers that were manufactured by a number of different companies, including Weil-McLain. Weil-McLain manufactured both residential and commercial boilers that were delivered either in sections that required assembly (section boilers) or in preassembled packages. Kinseth Plumbing and

Heating frequently ordered section boilers and assembled the pieces on site. In his years installing boilers, Kinseth personally installed many Weil-McLain section boilers.

Weil-McLain provided an instruction manual for installing its section boilers. The manual instructed service workers to join the pieces of the boiler together with "asbestos rope" to create a seal. Asbestos rope was typically eighty percent chrysotile asbestos. Almost always, the rope needed to be sized and cut, which released asbestos dust into the air. Kinseth and his installation crew followed the instructions and consequently inhaled asbestos dust each time they installed a Weil-McLain section boiler. Kinseth did not wear a protective mask when working with asbestos rope, and the manual did not indicate that working with the rope carried any medical risks. Additionally, some Weil-McLain section boilers instructed installers to use asbestos cement as a sealant. Although Weil-McLain did not itself manufacture the asbestos cement, it repackaged purchased asbestos cement into smaller, unlabeled containers and provided the cement with its section boilers.

Installing Weil-McLain boilers was not Kinseth's only exposure to asbestos throughout his career. Often, before Kinseth and his crew could install a new fixture, they would first remove the old fixture. The removal phase was "dusty as hell," resulting in Kinseth inhaling a significant amount of asbestos fibers. Kinseth also inhaled asbestos while installing boilers that were manufactured by other companies, including Peerless, Burnham, Crane, American Standard/Trane, Cleaver-Brooks, and Kewanee. Additionally, Kinseth worked with asbestos-containing cement and joint compound. Kinseth also installed hot air furnaces that contained asbestos. During installations, Kinseth

frequently cut gaskets, which released asbestos dusts, as well as refurbished valves that contained asbestos in their stem packing.

Kinseth worked full time on the installation crew and thus inhaled enormous amounts of asbestos until 1963. He then began performing more sales and bookkeeping work, although he continued to assist with installations in the field. In 1966, Kinseth and a friend purchased the business from Kenny. In 1972, Kinseth transitioned to working primarily in the storefront, although he continued to perform occasional hands-on work in the field until he retired from the family business in 1987.

Throughout his life, Kinseth was a healthy and active person. He and his wife, Shari, frequently entered couples golf tournaments. He liked to run and bike, and he never smoked. Kinseth had three children, Rick, Loreen, and Kim, and several grandchildren. He and Shari took many trips together and loved attending their grandchildren's baseball games.

In October 2007, Kinseth developed significant shortness of breath. His doctor ordered an x-ray, which revealed fluid in his lungs. Kinseth was admitted to the hospital and doctors drained 2000 milliliters, or two quarts, of fluid from his lungs. Later in October, Kinseth was again admitted to the hospital, and doctors performed a thoracotomy, in which they opened Kinseth's chest and removed a mass. The mass was biopsied and sent to the Mayo Clinic in Rochester, Minnesota, for analysis. The biopsy confirmed Kinseth had mesothelioma.

Mesothelioma is a type of cancer that attacks the lining of the lung. It is caused by inhaling asbestos, and there is a significant latency period between exposure and disease development. Many individuals are not diagnosed with mesothelioma until decades after their exposure.

There is no cure for mesothelioma. Patients faced with the diagnosis instead receive palliative treatments, such as chemotherapy, radiation, and surgery, which seek to slow the disease and relieve pain.

After Kinseth's initial diagnosis, a doctor at the Mayo Clinic informed him he had six to twelve months to live. The months following his diagnosis were trying for Kinseth and his family. He traveled to Rochester to receive chemotherapy. He traveled three times to Los Angeles to receive care and surgeries at the University of California, Los Angeles hospitals. Before one surgery in Los Angeles, Kinseth pulled his son Rick aside and gave him a piece of paper with all of his bank account numbers, lawyers' phone numbers, and other important information. Kinseth told Rick it was all the information he needed to take care of Shari if the surgery did not go well. Doctors at the UCLA hospital performed a pleurectomy with decortication surgery, which lasted over six hours, and removed a five and a half pound tumor. Kinseth recovered in the hospital for nine days, but stayed in Los Angeles for another two and a half months in order to receive twenty-five rounds of radiation. While receiving treatment in Los Angeles, Kinseth missed his brother Roger's funeral. In the months after his surgery, Kinseth relied on medications to manage his severe pain. He was unable to sleep for more than an hour or so at a time, as the pressure on his scar would rouse him awake.

In the final weeks of his life, Kinseth's three children alternated staying the night to help Shari care for him. A hospice nurse also visited to assist with his medications. Kinseth had limited mobility and stayed in a hospital bed in his living room. On January 5, 2009—fifteen months after his diagnosis—Kinseth passed away.

While receiving treatment, Kinseth and Shari filed suit on January 7, 2008, against forty-two companies that manufactured, sold, or distributed asbestos-containing materials. Kinseth brought claims of negligence, products liability, breach of warranty, and loss of consortium. Anticipating that Kinseth's health may decline before the case went to trial, counsel preserved his testimony through six days of videotaped depositions. Following his death, Shari and Rick continued the litigation as coexecutors of his estate.[1]

In a ninety-eight page summary judgment ruling, the district court clarified the applicability of Iowa's statute of repose to Kinseth's claims. Although Kinseth brought his claims within the limitations period for exposure to harmful materials, Iowa's statute of repose extinguishes causes of action "arising out of the unsafe or defective conditions of an improvement to real property" after fifteen years.[2] Iowa Code § 614.1(11) (2007). The court found that, once a fixture had been installed, it constituted an improvement to real property. Accordingly, any exposure to asbestos while *removing* boilers or other fixtures arose out of an improvement to real property and was barred by the statute of repose. However, any exposure to asbestos while *installing* boilers or other fixtures was not barred by the statute of repose.[3] Following the summary judgment ruling and several settlements, the number of defendants was reduced from forty-two to just one: Weil-McLain.

In anticipation of trial, Weil-McLain filed an extensive motion in limine. After a contested hearing, the district court ordered, in

---

[1]For clarity, we will continue to refer to the plaintiffs collectively as "Kinseth."

[2]The legislature has since narrowed the recovery period to ten years. *See* Iowa Code § 614.1(11)(*a*)(2) (2018).

[3]Kinseth does not appeal this ruling.

relevant part, that plaintiff's counsel shall not (1) mention prior jury trial verdicts or other lawsuits; (2) reference or comment on the amount of money or time spent by the defendant in the defense of this matter, including attorney time and expenses and expert witness time and expenses; (3) reference any other lawsuit in which this defendant may have been involved or is involved; (4) make any references, statements, or arguments that the jury should attempt to send defendant a message; and (5) make any reference to the wealth, power, corporate size or assets of Weil-McLain that would suggest to the jury that the jury ought to compare the relative wealth of the plaintiffs and defendant in answering the jury questions.

Additionally, Weil-McLain sought to include a number of responsible third parties on the special allocation-of-fault verdict form. Because Kinseth was exposed to asbestos while working with many different products, which were manufactured by many different companies, the district court ultimately permitted twelve other sources of exposure to be submitted to the jury. However, the district court concluded there was insufficient evidence to include McDonnell & Miller valves, Peerless pumps, Bell & Gossett pumps, Hoffman steam traps, and DAP caulk on the allocation-of-fault form.

The case proceeded to trial. After nearly four weeks of testimony, plaintiff's counsel presented her closing argument. Defense counsel raised five objections during the closing, alleging plaintiff's counsel repeatedly violated the in-limine order. After rebuttal by plaintiff's counsel in closing argument, wherein defense counsel again objected to in-limine violations, the court declined to read the jury instructions and instead adjourned for the day. The next morning, defense counsel immediately moved for a mistrial, arguing repeated in-limine violations

by plaintiff's counsel were prejudicial. The district court denied the motion.

The jury returned a verdict awarding Kinseth $4 million in compensatory damages. The jury concluded Weil-McLain was twenty-five percent at fault for Kinseth's harm and further concluded that punitive damages were warranted. Both parties then offered closing arguments on the amount of punitive damages. Following the second closing arguments, defense counsel again moved for a mistrial based on alleged in-limine violations by plaintiff's counsel during her second closing. The court denied the motion, and the jury ordered Weil-McLain to pay $2.5 million in punitive damages. Because the jury concluded Weil-McLain's conduct was not directed specifically at Kinseth, his estate was awarded twenty-five percent of the punitive damages award, and the Iowa Civil Reparations Trust Fund was awarded the remainder.[4]

Weil-McLain subsequently filed a motion for a new trial and a motion for judgment notwithstanding the verdict. Weil-McLain argued, *inter alia*, that (1) the district court erroneously instructed the jury by failing to include several manufacturers on the allocation-of-fault special verdict form, (2) plaintiff's counsel's numerous in-limine violations during closing arguments warrant a new trial, (3) evidence relating to OSHA violations and conduct barred by the statute of repose were improperly admitted, and (4) there was insufficient evidence to award punitive damages under the standard announced in *Beeman v. Manville Corp. Asbestos Disease Compensation Fund*, 496 N.W.2d 247, 256 (Iowa 1993). Kinseth also filed a contingent motion for new trial, objecting to the inclusion of two bankrupt entities on the allocation-of-fault verdict form.

---

[4]Following this award, the Iowa Civil Reparations Trust Fund intervened as a party.

The district court denied Weil-McLain's posttrial motions. It concluded, in relevant part, that (1) the identified manufacturers were properly excluded, as there was insufficient evidence to support a comparative fault instruction; (2) Weil-McLain waived any objection to counsel's statements during closing arguments by failing to make contemporaneous objections, and in any event, counsel's statements did not warrant a new trial; (3) OSHA evidence was properly admitted for causation purposes and the jury was properly instructed on how to allocate damages under the statute of repose; (4) the punitive damages award was supported by substantial evidence and consistent with the standard announced in *Beeman*, 496 N.W.2d at 255; and (5) bankrupt entities were properly included on the allocation-of-fault verdict form.

Weil-McLain appealed the district court's posttrial order and we transferred the case to the court of appeals. Kinseth cross-appealed, alleging Weil-McLain was estopped from challenging the compensatory damages judgment, defense counsel failed to make a timely motion for mistrial following closing arguments, and the district court erred in allowing the jury to apportion fault to bankrupt entities.

The court of appeals reversed, finding that defense counsel's mistrial motion was timely, plaintiff counsel's closing arguments were sufficiently inflammatory to warrant a new trial, and the district court erroneously excluded McDonnell & Miller valves from the special verdict form. Because the court was remanding the case for a new trial, it also reached the evidentiary issues that were likely to arise on remand. The court concluded that OSHA evidence was properly considered, the jury was properly instructed on the proper use of evidence barred by the statute of repose, and the district court did not err in including two

bankrupt entities on the allocation-of-fault form. The court, however, did not reach the issue of whether punitive damages were appropriate.

We granted Kinseth's application for further review.

## II. Standard of Review.

We review determinations of timeliness for correction of errors at law. Iowa R. App. P. 6.907. We review a district court's denial of a mistrial for an abuse of discretion. *State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017). Judicial estoppel is an "equitable doctrine invoked by a court at its discretion," and we therefore review questions of judicial estoppel for an abuse of discretion. *Tyson Foods, Inc. v. Hedlund*, 740 N.W.2d 192, 195 (Iowa 2007) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S. Ct. 1808, 1815 (2001)). Challenges to jury instructions are reviewed for correction of errors at law. *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016). We review evidentiary rulings for abuse of discretion. *Stender v. Blessum*, 897 N.W.2d 491, 501 (Iowa 2017).

## III. Analysis.

A number of issues have been properly raised for our review: (1) whether defense counsel's objections and motion for mistrial were timely, (2) whether plaintiff's counsel's statements during closing arguments warrant a new trial, (3) whether the doctrine of judicial estoppel bars Weil-McLain from appealing the compensatory damages award, (4) whether McDonnell & Miller valves were erroneously excluded from the allocation-of-fault special verdict form, (5) whether two bankrupt entities were erroneously included on the allocation-of-fault form, (6) whether evidence relating to Weil-McLain's OSHA violation was erroneously admitted, (7) whether the jury was erroneously permitted to hear evidence of conduct rendered noncompensable by the statute of

repose, and (8) whether punitive damages were appropriately awarded under the standard announced in *Beeman*, 496 N.W.2d at 255–56. We address each of these issues as necessary.

### A. Closing Arguments.

1. *Timeliness of closing argument objections and mistrial motion.* We first consider whether defense counsel failed to make timely objections to plaintiff's counsel's closing argument, as well as whether Weil-McLain's mistrial motion was timely.

On the morning of April 24, 2014, plaintiff's counsel presented her closing argument to the jury. Defense counsel objected to five statements, three of which were sustained. Following a noon recess and defense counsel's argument, plaintiff's counsel presented her rebuttal closing. Defense counsel objected to two statements, both of which were sustained. Immediately following plaintiff's rebuttal, the judge stated, "[I]t's 4:30, it's been a long day" and informed the jury he would not read the jury instructions at this time. Instead, the court would adjourn and resume proceedings the following morning at 9 a.m.

The next morning, at 9:02 a.m., defense counsel moved for a mistrial based on statements made by plaintiff's counsel during her closing arguments. Defense counsel maintained that plaintiff's counsel made roughly a dozen improper statements that were sufficiently prejudicial to warrant a mistrial. Defense counsel contended, among other things, that plaintiff's counsel improperly called into question the statute of repose, argued for an amount of compensatory damages that would "send a message" to Weil-McLain, and repeatedly referenced the amount of money Weil-McLain had spent on defending this and other cases. The district court overruled the motion for mistrial, concluding that "aside from the brake line issue, I was not given the opportunity to

pass on these things during closing argument by way of a timely objection, so I'm overruling the defendant's motion for mistrial on each and every respect."

In its posttrial motion, Weil-McLain renewed its argument for a new trial based on plaintiff counsel's closing argument. The district court again reiterated that defense counsel should have made contemporaneous objections during closing argument by plaintiff's counsel, rather than wait until the arguments were complete. Nevertheless, the court proceeded to the merits and, based on a review of the "voluminous record," found that counsel's remarks did not prejudice Weil-McLain.

"When an improper remark is made by counsel in the course of jury argument, it is the duty of the party aggrieved to timely voice objection." *Andrews v. Struble*, 178 N.W.2d 391, 401 (Iowa 1970). Timely objections give "the trial court an opportunity to admonish counsel or instruct the jury as it may see fit." *Id.* Indeed, we require prompt objection to discourage the wait-and-see approach, in which aggrieved parties refrain from objecting to remarks in a jury argument until after the verdict has been rendered. *Id.*

However, a party does not necessarily waive an objection to a remark made in a closing argument if the party fails to make a contemporaneous objection. *Id.* In *Andrews*, we highlighted the sound reasoning of the Nebraska Supreme Court, which explained,

> It could well be that any one improper statement would not constitute prejudicial error, while the cumulative effect of several would give rise to a claim of prejudice. Continued objections by counsel to prejudicial statements of opposing counsel in his argument to the jury could place the former in a less favorable position with the jury, and thus impose an unfortunate consequence upon his client which was actually caused by the wrongful conduct of opposing counsel. This

> he is not required to do. Attorneys engaged in the trial of cases to a jury know or ought to know the purposes of arguments to juries. When they depart from the legitimate purpose of properly presenting the evidence and the conclusions to be drawn therefrom, they must assume the responsibility for such improper conduct. They are in no position to demand that opposing counsel shall jeopardize his position with the jury by constant objections to their improper conduct.

*Id.* at 402 (quoting *Sandomierski v. Fixemer*, 81 N.W.2d 142, 145 (Neb. 1957)); *see also State v. Romeo*, 542 N.W.2d 543, 552 n.5 (Iowa 1996) ("It is not always essential that opposing counsel interrupt closing argument with an objection . . . ."). Thus, our rule instructs that "[w]here the closing arguments are reported," a party's "objection to the remarks of counsel during final jury argument urged at the close of the argument in motion for mistrial made before submission to the jury is timely." *Andrews*, 178 N.W.2d at 401–02. The district court therefore erred in requiring defense counsel to make numerous, contemporaneous objections during closing arguments.

Kinseth seizes upon the phrase "at the close of the argument" and asks that we require parties to move immediately for mistrial once the final jury argument has finished. Kinseth argues that defense counsel should have moved for a mistrial before or after the noon recess and, instead, waited almost a full day to make the motion, which diminished the curative abilities of the district court.

We require counsel to move for a mistrial before the case is submitted to the jury to ensure that the court has ample opportunity to "admonish counsel or instruct the jury" before deliberations begin. *Id.* at 401. Here, the court had the same opportunity at 9:02 a.m. as it did at 4:30 p.m. the day before to weigh the prejudicial nature of the statements and determine how best to proceed. Because defense counsel's motion for mistrial was made before the case was submitted to

the jury, and the court had time to weigh the motion and instruct the jury if necessary, the motion for mistrial was timely.

2. *Attorney misconduct.* We next consider whether the district court erred in denying Weil-McLain's motion for a new trial based on alleged violations by plaintiff's counsel of the in-limine order.

To warrant a new trial based on attorney misconduct, the complained of misconduct "must have been prejudicial to the interest of the complaining party." *Mays v. C. Mac Chambers Co.*, 490 N.W.2d 800, 803 (Iowa 1992). "[U]nless a different result would have been probable in the absence of misconduct, a new trial is not warranted." *Loehr v. Mettille*, 806 N.W.2d 270, 277 (Iowa 2011). Accordingly, we begin by assessing whether plaintiff's counsel indeed violated the court's in-limine order during her closing argument, and if so, we then consider whether the violations were so prejudicial that the outcome of the trial would likely have been different but for the misconduct.

a. *Purported misconduct.*

i. *Referencing the amount of money spent defending the suit.* The in-limine order barred plaintiff's counsel from referencing "the amount of money or time spent by the defendant in the defense of this matter, including attorney time and expenses and witness time and expenses." Weil-McLain identified eleven statements that allegedly violate this limitation:

> (1) "[T]hey had a very neat expensive graphic . . . ."
> (2) "Weil-McLain's own studies, if you buy their bought-for studies . . . ."
> (3) "Here I cannot imagine being in your situation where you had experts on both sides that make obscene money. The money in this litigation to me is amazing, so who do you believe?"
> (4) "You don't have to believe experts that are paid a lot of money, you can see [that the fibers get into the lungs]."

(5) "[B]ecause even from [their] bought and paid-for science . . . they would have been violating OSHA."

(6) "[Y]ou heard that there are 50 scientists that have published over 1,000 articles, they disagreed with what [Weil-McLain's] paid expert says . . . ."

(7) "[T]hey paid a company tens of thousands of dollars to create graphics to show you that."

(8) "35 percent of [the fourteen million requested in compensatory damages] is 4.9 million. That's half of what [defense expert] Mr. Rasmuson has made in two-and-a-half years as a 43-year-old man.  Half."

(9) "It's a simple test.  Then explain to me why you spent half a million dollars for the test if it was as simple as people cutting rope a couple of times, why wasn't that done and those straightforward results given to us."

(10) "You heard Mr. Rasmuson made $9 to 10 million in less than two-and-a-half years.  You heard that Weil-McLain spent half a million dollars on the study that could have been done as easily as the two minutes we saw on this floor. We heard that to show us how a boiler is installed, an issue that's not even disputed, they hire DecisionQuest and spend tens of thousands of dollars for it.  We've heard in this industry that $30 million went to not people suffering from mesothelioma, but to create literature to say brakes are safe."

(11) "What I suggest [for punitive damages] is anything that's in that one-to-three ratio of $4 million to $20 million is the right number.  It is certainly within the realms of what they have been paid in this litigation."

The identified statements fall within three categories: (1) questioning the reliability of self-funded studies, (2) questioning the credibility of an expert who is handsomely paid, and (3) directly commenting on the amount of money that the opposing party spent defending the action.

With respect to questioning the reliability of self-funded studies, in toxic tort cases, "expert medical and toxicological testimony is unquestionably required to assist the jury" in determining general and specific causation.  *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 688 (Iowa 2010).  "Where each side has adequate financial resources, the jury will be treated to a procession of persons with impeccable credentials

and persuasive testimony." Carl B. Rubin & Laura Rigenbach, *The Use of Court Experts in Asbestos Litigation*, 137 F.R.D. 35, 35 (1991). The jury inevitably faces a crossroads when "these experts, all armed with such qualifications, . . . reach diametrically opposite viewpoints depending upon which side they testify for." *Id.* The jury, as the arbiter of credibility, is left to decide which expert was more persuasive.

In order to prevail in the "battle of the experts," casting doubt upon the credibility of the opposing expert is critical. "[G]enerally 'the factual basis of an expert opinion goes to the credibility of the testimony . . . .'" *Ranes*, 778 N.W.2d at 693 (quoting *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)). Accordingly, when an expert witness has formed an opinion in favor of the defendant, based on a study commissioned by the defendant, plaintiff's counsel must be permitted to contest the objectivity of the expert's testimony.

Here, Weil-McLain's expert, Mr. Rasmuson, testified on cross-examination that the exposure simulation studies that he used to evaluate the exposure from asbestos rope and cement were sponsored by Weil-McLain. He also testified that when giving his opinion about the hazards of asbestos rope, he only considered studies paid for by Weil-McLain. Further, the other defense expert, Dr. Smith, testified on cross-examination that when evaluating Kinseth's levels of asbestos exposure from Weil-McLain boilers, he only spoke to the jury about studies that were funded by Weil-McLain.

Plaintiff's counsel did not violate the in-limine order when she reminded the jury that Weil-McLain's witnesses formed their opinions by solely looking at studies that were sponsored by Weil-McLain. In this instance, "bought and paid for" does not refer to the amount of money Weil-McLain spent defending this suit. Rather, the phrase reminds the

jury that it should be considering the reliability of the defendant's expert witnesses. Because this case involved a battle of the experts, and plaintiff is entitled to attack the objectivity of the factual bases underlying an expert's testimony, these comments did not violate the in-limine order.

Second, with respect to questioning the credibility of an expert who is handsomely paid, counsel is permitted to highlight the fact that an expert is paid during closing arguments.

> Evidence that a witness is receiving payment for his testimony, while it may be entirely proper, such as an expert hired to testify regarding an issue in the lawsuit, is relevant and admissible to show potential bias towards the party paying his fee. In closing argument the point can be made that the more favorable the paid expert's testimony is, the more likely he will be hired in the future.

8 Tom Riley & Peter C. Riley, *Iowa Practice Series[TM]*: *Civil Litigation Handbook* § 38.13, at 438 (2017). Plaintiff's counsel therefore did not violate any rule by referring to defense experts as "paid experts." The issue becomes more complicated, however, when counsel references an expert's fee in a manner that simultaneously alerts the jury to the large sums of money typically involved in asbestos litigation.

On cross-examination, Mr. Rasmuson testified that between 2012 and 2014, his company billed approximately nine or ten million dollars for drafting reports for asbestos-related litigation. He also testified that approximately eighty-five percent of his company's litigation work is asbestos-related. During her closing argument, plaintiff's counsel stated that the experts on "both sides" made "obscene money," and informed the jury they did not need "experts that are paid a lot of money" to conclude that asbestos fibers enter the lungs. On balance, these statements do not cross the line between impeachment and misconduct.

The jury already knew that the expert had received nearly ten million dollars in three years to assist companies in asbestos litigation. Again, counsel is permitted to question the credibility of an expert who is repeatedly paid to testify in defense of asbestos manufacturers.

However, plaintiff's counsel then framed Kinseth's requested compensatory damages amount as "half of what Mr. Rasmuson has made in two-and-a-half years as a 43-year-old man. Half." This statement goes well beyond impeachment and instead communicates to the jury that the requested award is reasonable *because* there are large sums of money involved in asbestos litigation. Thus, this statement was improper and violated the in-limine order.

Finally, plaintiff's counsel plainly violated the in limine order when she expressly referenced the amount of money Weil-McLain spent defending this suit. Plaintiff's counsel repeatedly emphasized the "expensive graphics" that Weil-McLain used, commented on the "amazing" amount of "money in this litigation," informed the jury that Weil-McLain "spent half a million dollars" on a "simple test," told the jury that Weil-McLain "spen[t] tens of thousands of dollars" on a "study that could have been done as easily as the two minutes we saw on the floor," and perhaps most jarringly, stated that a punitive damages award between $4 million and $20 million "is certainly within the realms of what [Weil-McLain] ha[s] paid in this litigation." The sole purpose of these statements is to alert the jury that Weil-McLain has deep pockets and can afford a substantial award. Counsel therefore violated the in-limine order prohibiting any reference to the amount the defendant spent defending this action.

ii. *Referencing corporate wealth, power, or assets.* The in-limine order proscribed "any reference to the wealth, power, corporate size or

assets of Weil-McLain which would suggest to the jury that the jury ought to compare the relative wealth of the plaintiffs and defendants in answering the jury questions." Defendant takes issue with the following three statements by plaintiff's counsel:

> (1) "You are trying to figure out how to make a company value pain and suffering of another human being. A company that values money maybe differently than people do in Wright County."

> (2) "[A]s you consider the damages in this case, you are speaking from people from this community to make sure that the people who are hurt in this community are heard from a company that values things differently than I think most of us do."

> (3) "And I want to acknowledge $100,000 would make this family rich. I mean there's no question about that, that is an insane amount of money to most people. The numbers we talk about here of $30 million for brake stuff and $10 million are insane amounts of money for real people. That is not why we're here. That is not what that is about."

While "earning power is important to be shown and proper to be argued in connection with the claim of damages," it is nevertheless improper for a jury to consider relative wealth "in the process of determining which, if either, party is entitled to recover." *Burke v. Reiter*, 241 Iowa 807, 815, 42 N.W.2d 907, 912 (1950). "By the same token any *comparison* of respective earning powers or financial or economic conditions is entirely improper." *Id.* at 815–16, 42 N.W.2d at 912. Because "[t]he temptation to resort to such comparison is strong," the district court must use its "discretion to determine whether proper bounds have been overstepped and, if so, whether serious prejudice has resulted." *Id.* at 816, 42 N.W.2d at 912.

Through her statements, counsel sought to impress upon the jury that it should assign a damages amount that would be significant to a corporation, as opposed to an average person. Indeed, since Weil-McLain

is a corporation with the sole purpose of generating a profit, the jury should award a sum that hits Weil-McLain where it hurts. While counsel did not insinuate that Weil-McLain should be held liable *because* it is a corporation that can afford it, her statements nevertheless invoked a direct comparison between the relative wealth of the defendants and ordinary people like the Kinseths. Thus, counsel violated the in-limine order.

iii. *Sending a message.* The in-limine order further prevented counsel from making "[a]ny references, statements, or arguments that the jury should attempt to send defendant a message." During the first closing argument, when discussing the appropriate compensatory damages for pain and suffering, plaintiff's counsel made the following statement:

> It is not about what the family needs, it is about sending a message to a company who you've evaluated how they spend some of their money, you've evaluated some of their actions with studies, what message they need in order to value this appropriately. That's why we're here.

It is facially improper to suggest that a jury use a compensatory damages award, which is designed to recompense the plaintiff for actual harms suffered, to punish the defendant. Thus, counsel violated the in-limine order by urging the jury to use its compensatory damages award to "send a message" to Weil-McLain.

iv. *Referencing prior lawsuits.* The in-limine order barred plaintiff's counsel from referencing "any other lawsuit in which the defendant may have been involved or is involved." Weil-McLain alleges plaintiff's counsel violated this directive when she made the following statement during her punitive damages closing argument.

> The last thing and this is the one that they said is we have hurt you, they have their lawyer say it. No one at the

company actually takes the stand and said that having thirty years of lawsuits they claim they have been heard.

Kinseth defends this statement on the ground that Weil-McLain's corporate representative, Paul Schuelke, testified during trial that the company first became involved in asbestos litigation in the 1980s. Kinseth therefore maintains it was permissible to remind the jury of Schuelke's testimony. On our review of the argument, we find counsel went far beyond reminding the jury of Schuelke's testimony. Instead, counsel sought to use the fact that Weil-McLain has been previously sued for asbestos exposure to support her request for a large punitive damages award in this case. Thus, counsel's reference to prior lawsuits violated the in-limine order.

v. *Calling the statute of repose into question.* Finally, Weil-McLain objects to characterization of the statute of repose made by plaintiff's counsel during closing arguments:

> (1) "I want to talk about the importance of the statute of repose. All of that work tearing out insulation to Weil-McLain boilers cannot be considered. Can't. It's a rule, it says in every meso[thelioma] case functionally, because you don't find out you're sick until 15 years later you just can't do anything to it and it applies to Weil just like it applies to all the other companies here, it really changed the nature of this case. You heard a lot about exposures, repairing valves and pumps, none of that can be considered."

> (2) "[A]nd so the effect of this rule, a rule I candidly don't understand, is not only do you not get to consider tear out of Weil-McLain boilers that happened many, many, many times, but you don't get to consider the fault of Taco where the actual exposures occurred. That is the effect of this bar after 15 years of exposure. And that's why I believe that for this company, the answer to proximate cause is no."

Weil-McLain argues these statements amount to instructing the jury to nullify the statute of repose and consider Kinseth's exposure during the removal process when calculating damages.

Instructing a jury on nullification is prohibited in Iowa. *State v. Willis*, 218 N.W.2d 921, 925 (Iowa 1974). "It is one thing to recognize jurors have the power not to do their duty and quite another to tell them they have a right not to do their duty." *Id.* at 924. Considering the identified statements in the context of counsel's argument, we do not believe counsel instructed the jury to nullify the statute of repose. In her opening statements, counsel walked the jury through the statute and expressly instructed them that any exposure during the removal process could not be considered when allocating fault. While examining witnesses, counsel clarified whether her questions related to the installation or removal process. Throughout the trial, counsel carefully abided by the statute of repose and took care to make the jury aware of what it may and may not consider when apportioning fault and damages. Thus, while it was improper to cast doubt on the public policy motivating the statute of repose, counsel's statements did not amount to nullification.

b. *Prejudice.* A new trial should not be ordered unless the attorney's misconduct, viewed cumulatively, is prejudicial to the complaining party and a different result would have likely occurred but for the misconduct. *Baysinger v. Haney*, 261 Iowa 577, 582, 155 N.W.2d 496, 499 (1968). Importantly, one or more violations of an in-limine order would not be per se grounds for a mistrial. *See Mays*, 490 N.W.2d 802–03 (finding the district court did not abuse its discretion in denying a motion for new trial despite multiple in-limine violations).

When attorneys approach the jury box to present their closing arguments, they carry with them an immense responsibility. Evidence has been received, witnesses have been heard, and counsel may now speak directly to the jury and tell the story of the case, from beginning to

end, largely free from interruption. Juries, of course, are instructed to decide the case on the evidence presented and not upon statements made during closing arguments. We presume juries follow this instruction and do not consider closing statements to be evidence.

Yet, juries are often tasked with deciding questions of fact and law that involve innately vague and difficult considerations. For example, juries often consider and valuate how much pain and suffering a plaintiff has experienced. When making challenging decisions about potentially nebulous concepts, juries will inevitably take cues from attorneys during their respective closing arguments. In such instances, we observe a heightened sensitivity to inflammatory rhetoric and improper statements, which may impress upon the jury that it can look beyond the facts and law to resolve the case. Attorneys have a duty to refrain from crossing the admittedly hazy line between zealous advocacy and misconduct.

Relatedly, attorneys may occasionally make one or more isolated missteps during closing arguments and thereby violate a pretrial order. It is a wholly distinct act of misconduct, however, to develop and present a theme for closing arguments that is premised upon improper jury considerations.

Based on our review of the entire content of the closing arguments, we believe the statements made by plaintiff's counsel fall into the latter category. The inescapable theme of counsel's closing argument is that Weil-McLain has chosen to spend exorbitant sums of money defending asbestos actions instead of compensating innocent victims, and this case is an opportunity to tell them what you, the jury, think of that choice. Given counsel's repeated, deliberate references to Weil-McLain's expenditures defending this suit and others, and instructions to use this

case to send a message about such expenditures, we must conclude that counsel's rhetoric prejudiced the defendant, and a new trial is warranted.

Because we find the case must be remanded for a new trial, we will consider any remaining issues that may arise again on retrial.

**B. Allocation of Fault.**

1. *Judicial estoppel.* Following the jury's verdict awarding $4 million in compensatory damages and concluding punitive damages were justified, plaintiff and defense counsels presented closing arguments on the appropriate amount of punitive damages. During defense counsel's argument, he stated to the jury,

> This isn't a big company, counsel's asked for a lot of money from a company that's relatively small to punish them. . . . [B]ut I think you've already sent your message here and . . . the amount that you put on that line really doesn't relate to any damages. If you put zero, it's still the same message, if you put one dollar, it's still the same message. If you put $100 it's still the same message. The people at Weil-McLain understand what you said here. They've been — they've been — *they're going to compensate these folks based on what you said* and the conduct is already over . . . . You've sent your message as far as the money.

(Emphasis added.)

After the jury returned the punitive damages verdict, Weil-McLain moved for a new trial on several grounds, including the erroneous exclusion of certain responsible third parties on the allocation-of-fault special verdict form. In response, Kinseth argued that Weil-McLain is estopped from challenging the compensatory damages verdict, as its statement that it is "going to compensate these folks based on what you said" committed the company to paying the full compensatory damages judgment. Although the district court did not expressly rule on the estoppel issue, it impliedly rejected the argument by reaching the question of whether certain companies were erroneously excluded from

the special verdict form. On appeal, the court of appeals held that judicial estoppel was inapplicable in this case, as the doctrine only applies to statements made in successive proceedings.

It is a "well-settled principle" that a "party who has, with knowledge of the facts, assumed a particular position in judicial proceedings is estopped to assume a position inconsistent therewith to the prejudice of the adverse party." *Snouffer & Ford v. City of Tipton*, 150 Iowa 73, 84–85, 129 N.W. 345, 350 (1911). The doctrine aims "to protect the integrity of the judicial process by preventing intentional inconsistency." *Vennerberg Farms, Inc. v. IGF Ins.*, 405 N.W.2d 810, 814 (Iowa 1987). Further, it "addresses the incongruity of allowing a party to assert a position in one tribunal and the opposite in another, thereby creating the perception that at least one court has been misled." *Id.*

We have previously clarified that "[j]udicial estoppel also applies when inconsistent positions otherwise meeting the requirements of this doctrine are taken in the same proceeding." *Duder v. Shanks*, 689 N.W.2d 214, 221 (Iowa 2004); *see also State v. Duncan*, 710 N.W.2d 34, 43–45 (Iowa 2006) (finding a criminal defendant was judicially estopped from arguing on appeal that admitting evidence of prior domestic abuse was prejudicial when the defendant affirmatively relied on such evidence at trial to support his theory of self-defense). Yet, a central tenet of the doctrine is "the successful assertion of the inconsistent position in a prior action." *Vennerberg*, 405 N.W.2d at 814. Judicial acceptance exists when "the position asserted by a party was material to the holding in the prior litigation." *Tyson*, 740 N.W.2d at 198. Without judicial acceptance of the inconsistent position, judicial estoppel is inapplicable, as there is "no risk of inconsistent, misleading results." *Vennerberg*, 405 N.W.2d at 814.

Here, there was no judicial acceptance of defense counsel's statement to the jury that Weil-McLain is "going to compensate these folks based on what [the jury] said." It was not material to any ruling, and at the time it was made, the jury had already returned its compensatory damages amount and decided punitive damages were justified. Thus, applying estoppel in this circumstance "does not advance the policy goal of avoiding inconsistent, misleading results." *Tyson*, 740 N.W.2d at 198.

2. *Comparative fault instruction for responsible third parties.* Because Weil-McLain is not estopped from challenging the compensatory damages judgment, we proceed to consider whether McDonnell & Miller valves were erroneously excluded from the allocation-of-fault special verdict form.

Iowa's comparative fault statute permits juries to attribute fault to parties other than the defendant, including "third-party defendants and persons who have been released pursuant to section 668.7." Iowa Code § 668.3(2) (2007). However, courts may only submit an issue to the jury if the issue is supported by substantial evidence. *Mitchell v. Cedar Rapids Cmty. Sch. Dist.*, 832 N.W.2d 689, 703 (Iowa 2013). Substantial evidence exists when "a reasonable person would find [the evidence] adequate to reach a conclusion." *Greenwood v. Mitchell*, 621 N.W.2d 200, 204 (Iowa 2001) (quoting *Bredberg v. Pepsico, Inc.*, 551 N.W.2d 321, 326 (Iowa 1996)). It requires more than mere speculation. *Id.* When weighing the sufficiency of evidence, we must "we give the evidence 'the most favorable construction possible in favor of the party urging submission.'" *Id.* at 205 (quoting *Hoekstra v. Farm Bureau Mut. Ins.*, 382 N.W.2d 100, 108 (Iowa 1986)).

In order for a jury to allocate fault against a party, the plaintiff must have a "viable claim against that party." *Spaur v. Owens-Corning Fiberglass Corp.*, 510 N.W.2d 854, 863 (Iowa 1994). In the context of asbestos litigation, viable claims are often constrained by two important considerations: proximate causation and statutes of repose.

A party's conduct is the proximate cause of a plaintiff's injury "when it is a substantial factor in producing damage and when the damage would not have happened except for the conduct." *Id.* at 858 (quoting 1 Iowa Civil Jury Instructions 700.3 (1991)). In asbestos cases, proximate causation requires showing more than the sheer possibility of exposure, but rather proof that the plaintiff "inhaled asbestos fibers as a result of being exposed to an asbestos-containing product manufactured and/or sold by [a defendant]." *Id.* at 862. However, we have clarified that "a reasonable inference of exposure to a defendant's asbestos-containing product, coupled with expert testimony regarding asbestos fiber drift and the cumulative effects of exposure to asbestos, is enough to prove proximate cause." *Beeman*, 496 N.W.2d at 254. "Proof of proximate cause in asbestos litigation is often limited to circumstantial evidence." *Huber v. Watson*, 568 N.W.2d 787, 790 (Iowa 1997).

Iowa's statute of repose extinguishes liability for asbestos exposure stemming from "unsafe or defective condition[s] of an improvement to real property" after fifteen years. Iowa Code § 614.1(11). Here, the district court concluded Kinseth does not have a viable claim against manufacturers whose products exposed him to asbestos during the removal process, as boiler tear-outs constitute an improvement to real property. Further, the court found that once a component part, such as a valve, becomes part of an improvement to real property, it does not lose its status as an improvement once it is detached and refurbished. Any

exposure to asbestos during the refurbishment process is therefore not compensable under the statute of repose and cannot give rise to a viable claim.

Accordingly, substantial evidence must exist in the record that demonstrates (1) Kinseth inhaled asbestos fibers as a result of working with a McDonnell & Miller valve, and (2) the exposure occurred while installing, not removing or refurbishing, fixtures or other component parts.

During his career, Kinseth sometimes worked with valves manufactured by McDonnell & Miller. Kinseth's testimony reveals two ways in which he was exposed to asbestos while working with the valves: refurbishing an old valve and cutting gaskets to place on the flanges of a new valve. When refurbishing a recycled valve, Kinseth used steel brushes or putty knives to remove the gasket, causing the gasket to powder and release asbestos dust into the air. Kinseth frequently refurbished McDonnell & Miller valves, and thus frequently inhaled asbestos. Any exposure to asbestos during the refurbishment process, however, is not compensable under the statute of repose and thus cannot be grounds to include the McDonnell & Miller as a responsible third party.

When working with new McDonnell & Miller valves, Kinseth testified the valves did not always come with gaskets on the flanges, and Kinseth would sometimes need to place a gasket on the flanges. The gaskets he used were either precut gaskets that were purchased along with the new valve, or separately purchased gaskets that needed to be sized and cut to fit the flange. Kinseth sometimes worked with gaskets that were purchased from McDonnell & Miller, although the company purchased gaskets from other manufacturers as well. Attaching a precut

gasket did not cause asbestos exposure, as the process did not invade the gasketing material. However, cutting a gasket to fit the flange caused the gasket to powder, which released asbestos dust into the air. Thus, it was not McDonnell & Miller's valves that exposed Kinseth to asbestos, but rather cutting separately purchased gaskets to place on the flanges of the valve that caused asbestos exposure.

In Weil-McLain's motion to include responsible third parties on the verdict form, it specified between the manufacturer and type of product that exposed Kinseth to asbestos. Accordingly, we are not deciding whether *any* product manufactured by McDonnell & Miller exposed Kinseth to asbestos, but whether McDonnell & Miller's *valves* exposed Kinseth to asbestos. Based on our review of the record, the district court properly excluded the valves from the allocation-of-fault verdict form, as Weil-McLain failed to adduce substantial evidence that McDonnell & Miller valves exposed Kinseth to asbestos.

3. *Allocating fault to bankrupt entities.* During trial, Kinseth objected to including two bankrupt entities, Hercules and Johns-Manville, on the allocation-of-fault verdict form, as the estate could not meaningfully recover from the entities. The district court denied the motion and the jury allocated ten percent fault, or $400,000 in damages, to Hercules and fifteen percent fault, or $600,000 in damages, to Johns-Manville. Kinseth had previously settled with both companies and, through the bankruptcy trust system, received $4690 from Hercules and $26,250 from Johns-Manville. Kinseth maintains the substantial disparity in assigned fault and recoverable damages is fundamentally unfair and contrary to the policy of chapter 668.

Kinseth primarily relies on *Spaur*, 510 N.W.2d 854, for the proposition that fault should not be allocated to bankrupt entities. In

*Spaur,* a defendant manufacturer objected to excluding Manville Trust from the allocation-of-fault verdict form. *Id.* at 862. At the time, Manville Trust was subject to a permanent injunction that "preclude[d] any litigation against Manville Trust as well as Manville Trust's participation in any way in any litigation." *Id.* at 863. The court determined that Manville Trust was not a "released party," as the plaintiffs did not "avail themselves of the procedure by which they could settle with Manville Trust in order to receive compensation." *Id.* Indeed, plaintiffs had not received any compensation from the Trust in exchange for a release. *Id.*

"In general, the purpose of section 668.3 is to make defendants pay in proportion to their fault." *Godbersen v. Miller,* 439 N.W.2d 206, 208 (Iowa 1989). Here, unlike in *Spaur*, the estate "avail[ed] [itself] of the procedure by which [it] could settle" with the parties and thereby received compensation from both entities in exchange for a release from liability. *Spaur,* 510 N.W.2d at 863. Accordingly, both Hercules and Johns-Manville are "released parties" as contemplated by section 668.3 and are properly subject to inclusion on the allocation-of-fault form.

## C. Admissibility of Evidence.

1. *OSHA evidence.* We next consider whether the district court erroneously admitted evidence relating to Weil-McLain's OSHA violations. In 1974, two years after OSHA promulgated asbestos regulations, OSHA cited Weil-McLain for a number of violations in its plant. One such citation was for failing to place warning labels on its asbestos products, including asbestos rope and cement. Indeed, despite having knowledge of the hazardous health risks of asbestos, Weil-McLain only began placing warnings on its asbestos products after the company was cited by OSHA.

In its motion in limine, Weil-McLain sought to wholesale prohibit any use of Weil-McLain's OSHA violations at trial, alleging that Kinseth stopped installing boilers in 1972, and thus any actions after 1972 are immaterial to this case. Further, Weil-McLain argues that even if Kinseth continued to work beyond 1972, the OSHA citation does not speak to the reasons behind the company's failure to warn and thus is not relevant to punitive damages. The district court denied the motion, finding the citation for failing to place warnings on asbestos products was relevant to Kinseth's punitive damages claim. The court informed the parties it would "tightly circumscribe" the use of the evidence and prevent any discussion of the violations beyond failure to warn.

Kinseth testified that, while he primarily worked in the office in 1972, and indeed had completed the vast majority of his installation work by 1972, he occasionally performed "hands-on" work in the field in a supervisory capacity until he retired in 1987. Thus, Weil-McLain's actions, or lack of actions, in 1974 are relevant to Kinseth's case. Moreover, evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "[t]he fact is of consequence in determining the action." Iowa R. Evid. 5.401. Evidence that Weil-McLain did not place warnings on its asbestos products until OSHA issued a citation, despite having knowledge of asbestos' risks, clearly has a tendency to make it more or less probable that Weil-McLain acted with a "willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1(1)(*a*). Because the evidence is relevant, the district court did not abuse its discretion in denying the motion in limine.

During trial, the district court determined additional evidence about Weil-McLain's other OSHA citations could be admitted. The court

explained that during defense counsel's examination of its own witness, Mr. Schuelke, counsel asked about the nature of the OSHA violations, and thus "kicked open the door" on the issue. Although Weil-McLain similarly challenges this decision on appeal, we decline to reach the issue, as it is uncertain whether the situation will again arise on retrial.

2. *Statute-of-repose evidence.* Prior to trial, the district court determined that any exposure to asbestos arising from the removal process was noncompensable under the statute of repose. Weil-McLain contends the jury was erroneously permitted to hear evidence of Kinseth's exposure to asbestos while removing Weil-McLain's boilers, despite such exposure being noncompensable and therefore irrelevant.

The district court declined categorically to exclude this evidence because it determined that it was important for the jury to understand Kinseth's total exposure to asbestos, from all manufacturers, in order to determine causation. Indeed, the court found that in order for the jury to determine which manufacturers contributed to Kinseth's mesothelioma, and to what degree, the jury must be permitted to consider activities that were not compensable but nevertheless contributed to the Kinseth's cancer.

We agree that evidence of exposure during the removal process, while noncompensable, was nevertheless relevant to the question of causation. Further, we presume juries follow the court's instructions. *State v. Proctor*, 585 N.W.2d 841, 845 (Iowa 1998). Thus, the district court did not abuse its discretion in permitting the jury to hear evidence of Kinseth's exposure during the removal process and instructing the jury on the proper use of such evidence.

**D. Punitive Damages.** Finally, Weil-McLain alleges that Kinseth introduced insufficient evidence to submit the issue of punitive damages

to the jury. Specifically, Weil-McLain asserts that in order for punitive damages to be warranted, Kinseth must prove that Weil-McLain's conduct deviated from that of others in its industry. Weil-McLain's assertion rests on its interpretation of *Beeman*, 496 N.W.2d at 255–56, which we will now clarify for retrial.

In *Beeman*, a plumber, Joseph Beeman, contracted pleural plaques and asbestosis from working closely with asbestos-containing materials throughout his career. *Id.* at 249–50. Beeman sued Johns-Manville Corporation (JM), Keene Corporation (Keene), and other companies that manufactured asbestos-containing products. *Id.* at 250. Following a number of settlements, Beeman proceeded to trial against JM and Keene. *Id.* At trial, the jury heard evidence that some studies in the 1920s and 1930s linked asbestos with health problems and that "JM itself financed asbestos hazards studies in the 1940s and 1950s." *Id.* Yet, we found "it was not until 1965, when the Selikoff study was published, that a clear connection between exposure to asbestos by end-users, such as Beeman, and lung problems was established." *Id.* Thus, the evidence at trial showed that one defendant, JM, had specific knowledge of the dangers of asbestos well before 1965, while the other defendant, Keene, only had general industry knowledge beginning in 1965. *Id.*

At the close of trial, the district court submitted a punitive damage claim against Keene, but not JM, as JM was subject to a federal bankruptcy court reorganization plan that precluded punitive damages. *Id.* at 250, 255 n.3. The jury awarded Beeman $1.175 million in actual damages, as well as assessed $5 million in punitive damages against Keene. *Id.* at 250. JM and Keene both filed posttrial motions for a new trial and judgment notwithstanding the verdict. *Id.* The district set aside the punitive damages award and Beeman appealed. *Id.*

On our review, we explained "[p]unitive damages are not compensatory; they are for punishment and deterrence." *Id.* at 255. To receive punitive damages, a plaintiff must demonstrate "by a preponderance of clear, convincing, and satisfactory evidence that the defendant's conduct amounted to a willful and wanton disregard for the rights or safety of another." *Id.*

We determined Beeman offered insufficient evidence to support a claim for punitive damages against Keene. *Id.* We noted, "Keene and its predecessors manufactured and distributed asbestos-containing thermal insulation materials for many years. Many other companies performed similar services. Asbestos was recognized as the best insulating material available, because of its heat resistance and practical indestructibility." *Id.* At the same time, reports of the hazards of asbestos continued to appear in scientific literature. *Id.* We found "reports regarding dangers of asbestos to insulators and bystanders, such as Beeman, were ambiguous before 1965." *Id.* at 255–56.

Importantly, we emphasized the difference between general industry knowledge and actual conduct. *Id.* at 256. We explained,

> Even though reasonable jurors could find that the manufacturers had enough knowledge to trigger a duty to warn of the potential hazards of their products, and that such failure amounted to negligence, the real issue here is conduct. For punitive damages, a defendant's conduct must be more egregious than mere negligence; it must amount to a willful and wanton disregard for the public's rights or safety established by a preponderance of clear, convincing, and satisfactory evidence.

*Id.* Accordingly, we clarified "punitive damages may not be assessed against Keene based on the general knowledge of the asbestos industry. Instead, there must be clear, convincing, and satisfactory evidence that sets Keene's conduct apart from that of other asbestos manufacturers."

*Id.* Because Beeman failed to show that Keene, specifically, willfully and wantonly disregard the rights and safety of the public, punitive damages were inappropriate. *Id.*

Here, Weil-McLain seizes upon the phrase "sets Keene's conduct apart from that of other asbestos manufacturers" and maintains that, in order to receive punitive damages, Kinseth must show that Weil-McLain's conduct—failure to warn—deviated from its peers. However, this reading of *Beeman* ignores the distinction between defendants with specific knowledge of potential harms and defendants merely charged with general industry knowledge.

*Beeman* instructs that if a defendant lacked specific knowledge of a potential harm *and* its conduct did not set it apart from others with the same general knowledge, any failure to warn was no more than negligence. However, if a defendant had specific knowledge of the potential harms of asbestos and failed to act, it will not be shielded from punitive damages simply because its peers, who may or may not have had specific knowledge, similarly failed to act. Rather, the willfulness and wantonness of its failure to act will be considered in light of its specific knowledge, as well as other contextual evidence. The defendant's conduct must still be "more than merely objectionable" and "more egregious than mere negligence." *Id.* at 255–56.

**IV. Conclusion.**

Because statements made by plaintiff's counsel during closing arguments were prejudicial, we remand the case for a new trial. On remand, McDonnell & Miller valves shall not be included on the special allocation-of-fault verdict form, both Hercules and Johns-Manville shall be included on the verdict form, evidence of the OSHA citation for failing to warn is admissible, evidence relating to conduct rendered

noncompensable by the statute of repose is admissible if a proper limiting instruction is provided, and the court shall consider the punitive damages issue in light of our clarification of *Beeman.*

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND REVERSED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR NEW TRIAL WITH INSTRUCTIONS.**