# IN THE COURT OF APPEALS OF IOWA

No. 19-0469
Filed November 4, 2020

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**DREW ALAN MANGLER,**
      Defendant-Appellant.

_____


Appeal from the Iowa District Court for Jackson County, Joel W. Barrows, Judge.


Drew Mangler appeals following his conviction for murder in the second degree. **AFFIRMED.**


Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.


Heard by Mullins, P.J., and May and Schumacher, JJ.

**MAY, Judge.**

Someone killed James Remakel by stabbing him thirty-two times. The State charged Drew Mangler. A jury convicted Mangler of murder in the second degree. Mangler challenges his conviction on four grounds, arguing: (1) there is insufficient evidence that he is Remakel's killer, (2) a jury instruction was misleading and confusing, (3) some evidence was improperly excluded, and (4) he is entitled to a new trial because of a *Brady* violation.[1] We affirm.

## I. Facts and Prior Proceedings

James Remakel lived in Bellevue, Iowa. He had "a very serious back condition." For the most part, he was homebound, relying on others for help around the house. And he received home deliveries for much of his material needs.

On December 18, 2016, Richard Steines spoke with Remakel on the phone. They made plans for Steines to bring Remakel a meal on Christmas Day. When Steines arrived on December 25, he found Remakel deceased. The back door was broken and hanging open.

### A. December 25 Investigation

Bellevue Police Department Officers Josh Kilburg and Ryan Kloft investigated Remakel's house on Christmas Day. When they pushed open the back door, part of the doorframe fell to the floor. They "immediately noticed the overwhelming smell of death and decay" and believed Remakel had died from "a medical issue." Remakel's body was in his bedroom. After confirming Remakel

---

[1] *See Brady v. Maryland*, 373 U.S. 83 (1963).

was deceased though, the officers did not inspect Remakel's body further due to the distressing smell. When the county medical examiner saw Remakel's body, he advised that it was "a crime scene." Police then contacted the Division of Criminal Investigation (DCI) and "taped the entire lot off." However, personnel had already walked through the kitchen.

Investigators found "damage to the actual striker plates" on Remakel's door and "a possible footwear impression" on two different doors, suggesting the doors had been kicked in. There was blood in the bedroom, the kitchen, and the bathroom. All DNA samples from the house matched Remakel's profile.

In Remakel's bedroom, there were locked dresser drawers that had been forced open. Inside, investigators found three bank bags with coins inside and various prescription-drug bottles (some empty, some with pills inside).

No usable fingerprints were found in Remakel's home. But investigators did record twenty-six footwear impressions from the flooring and two doors.

Remakel's autopsy revealed that he "sustained thirty-two sharp-force injuries." The medical examiner testified that "simply he bled out." Remakel's body showed signs of decomposition, meaning he "had been dead a few days prior to December 25." The medical examiner could not "give an exact day." But phone records, utility records, and witness observations suggested Remakel died on December 19 or December 20.[2]

---

[2] Remakel's phone records showed that he "neither made nor answered any call after 7:26 p.m." on December 19. Records show his water usage dropped to zero after December 19.

A department-store employee spoke with Remakel on the phone on December 18 to arrange a return through FedEx. A FedEx driver received "no

Investigators interviewed witnesses with known connections to Remakel. On December 27, a DCI special agent interviewed Mangler. Mangler told the agent he used to do odd jobs for Remakel for $10 per hour in cash but quit in March 2016. Mangler claimed he had not spoken to Remakel for months. Mangler said he went to Bellevue on December 23 or December 24 but "those two times were the only recent times he had been there."

As it turns out though, Mangler was also in Bellevue on December 19 and December 20.

### B. The Night of December 19

On the night of December 19, Mangler met his friend, Brady Hutchcroft, at the Bellevue bar where Hutchcroft worked. They took Hutchcroft's car to Ryleigh Perkins's residence in Bellevue. They arrived sometime after 8:00 p.m. The three

---

response at all" from Remakel's home on December 22 despite two loud attempts that day.

John Hoff, one of Remakel's acquaintances, testified that he drove by Remakel's house on December 21 or December 22. He saw "a package on [Remakel's] front door, front step." Hoff knew Remakel "never used the front door," so he picked up the package and left it inside the back porch. He did not look into the kitchen or go past the back porch. But he did find it abnormal that Remakel did not greet him in the kitchen, as that was his normal spot in the house.

Remakel had an order of "thick-cut ribeyes" from Bender's Foods that he was supposed to pick up on December 21. The meat-counter manager testified that Remakel was a regular customer who "pretty much always picked [his orders] up on the day that he said he was going to." Peter Connolly, a volunteer in the community, was scheduled to pick up Remakel and drive him to Bender's Foods on December 21. Remakel did not answer the door or his phone when Connolly called him. And no one picked up Remakel's order.

However, on December 20, LouAnn Scheckel attempted to deliver Remakel's prescriptions to his house. As usual, she knocked and then walked into the house calling his name. She walked through the hallway to the bathroom. But did not find Remakel, so she left with the prescriptions. Scheckel testified that she did not see anything out of the ordinary in Remakel's home. But there was no evidence that she went into Remakel's bedroom, where he was found on December 25. And she admitted that she did not make detailed observations.

drank beer, smoked marijuana, and played video games for about two hours. Then they went to Hutchcroft's house—also in Bellevue—to drink more beer and hang out.

At some point in the evening, Mangler left Hutchcroft's house by himself on foot. Perkins testified that he thought Mangler left around "10:00 p.m." Perkins told investigators he thought Mangler was going to get cocaine. And Hutchcroft told investigators he thought Mangler was getting marijuana. But Mangler did not return with either drug.

Laverne Jackson lives on the same block as Hutchcroft. Around 11:00 p.m. that night, Bellevue Police Officer Brent Roling received a call from Jackson. She said Mangler "came to her residence, came into the house, and . . . he was unwanted at the residence at that time." Jackson's sister was present when Mangler arrived. She testified that Mangler "just barged right in the door." Jackson yelled at Mangler that she did not want him there and pushed him out of the door. Mangler left shortly after the encounter. So Officer Roling patrolled the area around Jackson's residence.

One or two hours after Mangler left on his own and walked around Bellevue, Mangler returned to Hutchcroft's house.[3] Hutchcroft's house is only five blocks from Remakel's home.

After Mangler returned, Mangler, Perkins, and Hutchcroft went back to Perkins's residence to get his car. Perkins testified that at that point "it had to have

---

[3] Perkins testified that Mangler was gone for "over an hour" and it might have been an "[h]our and a half." Hutchcroft testified that Mangler was gone for "an hour and a half, maybe two hours."

been close to midnight." They planned to go to Maquoketa to find drugs, but Perkins's car was plowed into a snowbank.

Around 1:45 a.m., Officer Roling found Mangler, Perkins, and Hutchcroft all "trying to get a car out of a snowbank." At this point, Mangler, Perkins, and Hutchcroft were near Perkins's residence—about six blocks from Remakel's home.

Officer Roling asked Mangler about his visit to Laverne Jackson's house. Mangler told Officer Roling that he "just stopped in, hadn't seen [Jackson] in a while, just stopped in to say hi, wish her a [M]erry Christmas." Officer Roling did not arrest or detain anyone. So Mangler, Perkins, and Hutchcroft pushed the car onto the road and continued to Maquoketa.

On the way to Maquoketa, Mangler gave Perkins money for gas. Perkins testified that Mangler had a wad of cash "in the vehicle as we were traveling to Maquoketa." The cash consisted of "$20s" and "at least one $50."[4]

## C. December 20 and After

On December 20, Mangler and Hutchcroft went to a pawn shop. Mangler bought a snowboard for $160.49. He paid with $200 in cash.

---

[4] Perkins testified that he was "pretty sure" Mangler had the money at the beginning of the night, but he did not remember seeing the wad of cash at his residence. During Perkins's first interview with investigators, he said he did not remember seeing Mangler's wad of cash until after Mangler left Hutchcroft's house by himself. But during his second interview with investigators, Perkins recalled that—before going for his walk—Mangler told him and Hutchcroft he was going to find some cocaine. And Mangler showed them the wad of cash to explain how he planned to pay for it. But Perkins admitted that he talked to Mangler and others before this second interview.

The pair then went to Diamond Jo's casino. Mangler paid in cash and even loaned cash to Hutchcroft. In total, Mangler spent at least $400 in cash—but likely much more—in the twenty-four hours immediately following his walk alone in Bellevue on the night of December 19.

Investigators looked into Mangler's finances. On December 19 at 2:23 p.m., Mangler sent a Facebook message that said "I have no money yet." That same day, Mangler sent another Facebook message at 4:44 p.m. asking someone for money. Mangler had approximately $3 in a checking account on December 19. And he had $11 in a savings account. Mangler was receiving unemployment payments of $379 per week—but the payment issued on December 19 was not received or cashed until three or four days later.

Investigators seized a pair of Mangler's shoes. The seized shoes appeared to match the shoes Mangler was seen wearing in Diamond Jo's security camera footage from December 20. A DCI criminologist compared the footwear impressions found in Remakel's home to Mangler's shoes. Here is how he explained his findings to the jury:

> Upon completion of my examination, there were six [footwear impressions] that [in] my opinion . . . the left shoe could have made. There were five that the right shoe could have made. There were four that were just of similar sole design, but due to the limited nature of those impressions, nothing further could be stated. And then there were twelve that were not made by that pair of shoes.

He added that "[a]nother shoe could have made those [impressions] . . . [but it] would have to be awfully close to that design." Also, the jury was shown the crime scene footwear impressions with a transparent overlay of Mangler's shoe pattern. So the jurors could make their own assessment.

Investigators found blood on the tongue of Mangler's right shoe. DNA testing confirmed the blood was Remakel's.

The State charged Mangler with first-degree murder for killing Remakel. A jury found Mangler guilty of second-degree murder.

## II. Analysis

On appeal, Mangler challenges: (1) the sufficiency of the evidence, (2) jury instruction twenty-nine, (3) exclusion of the word "manslaughter" in a voicemail message, and (4) denial of his motion for a new trial. We address each in turn.

### A. Sufficiency of the Evidence

Mangler first contends the State did not prove "beyond a reasonable doubt Mangler was the person who killed Remakel." He claims "[t]here was no evidence that specifically tied Mangler to the death of Remakel." And Mangler draws our attention to eight alleged shortcomings in the State's case: (1) no blood or DNA evidence links Mangler to the crime scene; (2) Mangler's shoe print was not unique, and it is not a perfect match with the footwear impressions at Remakel's home; (3) there were no identifiable fingerprints at the crime scene; (4) although Mangler gave a pill to Perkins on the night of December 19, there is no evidence it came from Remakel's home; (5) there is no proof Mangler had no money before he walked around in Bellevue on the night of December 19; (6) Mangler's family testified that he was his normal self during the week leading up to Christmas; (7) because Perkins and Hutchcroft were intoxicated on the night of December 19, their testimony about the duration of Mangler's absence is untrustworthy; and (8) two witnesses allegedly entered Remakel's home after December 19 and did not see anything unusual.

Under Iowa law though, we will "uphold a verdict if substantial evidence supports it." *State v. Quinn*, 691 N.W.2d 403, 407 (Iowa 2005); *see State v. Kelso-Christy*, 911 N.W.2d 663, 666 (Iowa 2018) ("We review the sufficiency of the evidence for correction of errors at law."). Evidence is "substantial if it would convince a rational fact finder the defendant is guilty beyond a reasonable doubt." *State v. Meyers*, 799 N.W.2d 132, 138 (Iowa 2011). "We view the evidence in the light most favorable to the State, including all legitimate inferences and presumptions that may fairly and reasonably be deduced from the record." *State v. Soboroff*, 798 N.W.2d 1, 5 (Iowa 2011). We make no distinction between direct and circumstantial evidence. *See Kelso-Christy*, 911 N.W.2d at 668 ("Direct and circumstantial evidence are equally probative." (citation omitted)).

Our review has revealed ample evidence—some direct, some circumstantial—that Mangler killed Remakel on December 19 or December 20, 2016. In brief summary, evidence supporting the verdict shows: (1) Remakel's blood was found on the tongue of Mangler's shoe; (2) Mangler's shoe prints were similar to the footwear impressions on Remakel's floors and doors; (3) Mangler attempted to hide from police the fact that he was in Bellevue on December 19 and December 20; (4) Mangler had opportunity to kill Remakel—he was in Bellevue, on his own, just five blocks from Remakel's home, in the same general timeframe that investigators believe Remakel was murdered; (5) Mangler had a motive to kill Remakel—he seemed to have no money early in the evening on December 19, he knew Remakel kept cash and prescriptions on hand, and he wanted drugs; and (6) after walking around on his own in Bellevue near Remakel's home, Mangler had a sudden influx of cash, which he spent at a pawn shop and casino the very next

day. From this evidence, the jury could reasonably connect the dots and conclude Mangler was Remakel's killer beyond a reasonable doubt. *See Meyers*, 799 N.W.2d at 138. Sufficient evidence supports the jury's verdict.

### B. Jury Instruction Twenty-Nine

Mangler next contends that "[t]he district court erroneously combined the instruction that murder in the second degree does not require specific intent with the general intent instruction." He claims that "[t]he combined instruction . . . is misleading and confuses the malice aforethought" standard. Specifically, he asserts that giving a definition of general intent and tying it to second-degree murder "creates a danger that the jury will apply the general intent instruction . . . to murder in the second degree as a whole," and "apply general intent concepts to the malice aforethought instruction."

We generally "review challenges to jury instructions for correction of errors at law." *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016) (citation omitted). But we do not believe Mangler's appellate argument was preserved for our review. It is true that, during trial, Mangler objected to jury instruction twenty-nine.[5] But his argument now is different from his objection at trial. This is what he said at trial:

---

[5] Instruction twenty-nine stated:
> Murder in the Second Degree does not require a specific intent to kill another person.
> Concerning only the charge of Murder in the Second Degree, you are instructed that in order to commit a crime a person must intend to do an act which is against the law. While it is not necessary that a person knows the act is against the law, it is necessary that the person was aware he was doing the act and he did it voluntarily, not by mistake or accident. You may, but are not required to, conclude a person intends the natural results of his acts.

> The second paragraph of [instruction twenty-nine] tells the jury essentially that murder in second degree is a general intent crime, which is what current case law clearly states. However, I believe that case law is in error and, in fact, murder in the second degree is actually a specific intent crime.
>     . . . .
>     . . . [The jury] should not be instructed that it's a general intent crime.

This objection—that the law should be changed—is not the same as Mangler's argument on appeal—that the instruction was confusing. And "[i]t is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Bank of Am., N.A. v. Schulte*, 843 N.W.2d 876, 883 (Iowa 2014) (citation omitted). Because Mangler did not raise—and the district court did not rule on—Mangler's current argument, Mangler failed to preserve error.

As a fallback position, Mangler claims that "[t]o the extent error is not preserved, Mangler was denied the effective assistance of counsel."[6] "To establish [a] claim of ineffective assistance of counsel," the defendant must show their "trial counsel failed to perform an essential duty and counsel's failure resulted in

---

[6] Generally, "ineffective assistance of counsel claims are best resolved by postconviction proceedings to enable a complete record to be developed and afford trial counsel an opportunity to respond to the claim." *State v. Truesdell*, 679 N.W.2d 611, 616 (Iowa 2004). Here, however, the record is sufficient for our analysis.

We also recognize Iowa Code section 814.7 was recently amended to provide in pertinent part: "An ineffective assistance of counsel claim in a criminal case shall be determined by filing an application for postconviction relief" and "shall not be decided on direct appeal from the criminal proceedings." *See* 2019 Iowa Acts ch. 140, § 31 (codified at Iowa Code § 814.7 (2020)). In *State v. Macke*, however, our supreme court held these amendments "apply only prospectively and do not apply to cases pending on July 1, 2019." 933 N.W.2d 226, 235 (Iowa 2019). Therefore, we conclude the amendments "do not apply" to this case, which was pending on July 1, 2019. *See id.*

constitutional prejudice." *State v. Walker*, 935 N.W.2d 874, 881 (Iowa 2019). If a defendant fails to show *Strickland*[7] prejudice, it is not necessary for the court to consider whether counsel breached an essential duty. *See King v. State*, 797 N.W.2d 565, 574 (Iowa 2011) ("In this case, however, it is not necessary to decide the issue of whether King's counsel provided inadequate assistance because, upon our review of the entire record, we conclude that King has failed to show prejudice as required under the *Strickland* test."). "To establish" *Strickland* prejudice—also referred to as "constitutional prejudice"—"the defendant is required to show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Walker*, 935 N.W.2d at 881 (citation omitted). "It is not enough for the defendant to show that the errors had [only] some . . . effect on the outcome of the proceeding." *Id.* (alteration in original) (citation omitted). "Rather, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (alteration in original) (citation omitted).

We conclude Mangler cannot show *Strickland* prejudice. The marshalling instruction on second-degree murder required the State to prove malice aforethought. A separate instruction gave this correct definition of malice aforethought: "'Malice aforethought' is a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time." *See, e.g.*, *State v. Buenaventura*, 660 N.W.2d 38, 49 (Iowa 2003) ("'Malice aforethought is a fixed purpose or design to

---

[7] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

do some physical harm to another that exists before the act is committed.'  Like premeditation, '[i]t does not have to exist for any particular length of time.'" (alteration in original) (citation omitted)).  And the jury was instructed that any time "the State must prove something, it must be by evidence beyond a reasonable doubt."  So jurors were instructed that, unless the State proved malice aforethought beyond a reasonable doubt, they could not return a verdict finding Mangler guilty of second-degree murder.  We presume the jury followed those instructions.  *See Kinseth v. Weil-McLain*, 913 N.W.2d 55, 73 (Iowa 2018).

Moreover, as Mangler concedes, the fighting issue in this case was the offender's *identity*.  It was more about who the offender was and much less about whether the offender had bad intentions.  The offender inflicted "thirty-two sharp-force injuries" on Remakel.  This repetitive stabbing left no serious question as to whether the offender acted with malice aforethought, "a fixed purpose or design to do some physical harm to another which exists before the act is committed."  Even assuming "a fixed purpose or design to do some physical harm" had not yet formed before the first stab, it surely must have formed by the time the offender stabbed Remakel for the second time—or the fifth time—or the tenth time—or the fifteenth time—or the twentieth time—or the thirtieth time—or surely by the thirty-second time the offender stabbed Remakel with a sharp object.  So once the jury determined Mangler was the offender, the jury would almost certainly conclude Mangler acted with malice aforethought.

In short, we see no "reasonable probability that, but for" counsel's failure to object to the jury instructions given, "the result of the proceeding would have been

different." *Walker*, 935 N.W.2d at 881 (citation omitted). Accordingly, we decline to grant relief on Mangler's ineffective-assistance claim.

### C. Exclusion of Voicemail Message

Next Mangler draws our attention to Joe Rogge, a Bellevue resident who was known to rummage through trash.[8] On December 16—three days before Remakel was likely murdered—Rogge left a voicemail for Mary Bartels. In it, Rogge said the word "manslaughter." But the voicemail did not mention anything connecting it to Remakel.

Mangler sought to introduce the voicemail at trial. He argued it was relevant because it "suggest[s] that [Rogge] might have been responsible for Mr. Remakel's death, and he's a person of interest that should have been investigated thoroughly." The court excluded the voicemail, ruling:

> I do think it's hearsay, but I also don't believe that it's relevant. It occurred before the homicide. There's no stated connection to the victim in the message. I do think that the potential prejudice outweighs the probative value, which is almost nonexistent, and frankly, given the availability of inquiry into the investigation concerning Mr. Rogge,[9] I don't see how keeping this out prejudices your client, so I'm going to keep it out.

On appeal, Mangler argues the district court erred in excluding the voicemail on hearsay grounds. But Mangler does not attack the additional grounds on which

---

[8] When officers interviewed Rogge at his apartment, he showed them a monitor and hard drive he took from Remakel's trash. The officers did not search the residence, but Rogge let them look into his backpack where they found razor blades and a surgical scalpel. Rogge told officers that he would "never put [the] scalpel into flesh."

[9] Rogge was investigated by officers and interviewed three times. He was unable to give officers a timeline of his activities during the week before Christmas, but there were no reports that Rogge was near Remakel's home on December 19 or December 20.

the district court excluded the voicemail, namely, relevance and "that the potential prejudice outweighs the probative value," if any. And we believe exclusion was authorized by Iowa Rule of Evidence 5.403. Rule 5.403 grants the court discretion to exclude evidence if "its probative value is substantially outweighed" by the "danger" of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Because "[w]eighing probative value against prejudicial effect is not an exact science, . . . we give a great deal of leeway to the trial judge who must make this judgment call." *State v. Einfeldt*, 914 N.W.2d 773, 784 (Iowa 2018) (internal quotation marks omitted) (citation omitted). And on this record, we see no abuse of discretion in the court's decision to exclude the mere fact Rogge said the word "manslaughter"—without any connection to Remakel—in a voicemail. Because we affirm on this ground, we need not decide whether our hearsay rules provide an additional basis to exclude the voicemail. *See Tate v. Derifield*, 510 N.W.2d 885, 887 (Iowa 1994) ("On appeal we may affirm the district court ruling upon any ground raised in district court . . . .").

### D. *Brady* Violation

Finally, Mangler contends the district erred in denying his motion for new trial. In his motion, Mangler alleged a *Brady* violation, meaning the State prevented Mangler's access to favorable evidence that was relevant to his defense. *See* 373 U.S. at 87. However, like the district court, we do not believe Mangler has shown grounds for relief.

Mangler's motion focuses on Tina Trenkamp. On December 23, Trenkamp and Heather Merrick took an evening walk near Remakel's street. They saw

Rogge walking back and forth in front of Remakel's home. This was not an especially uncommon encounter: Rogge was known to sort through trash cans. Trenkamp and Merrick frequently ran into Rogge on their walks.

Soon after the discovery of Remakel's death, Officer Kilburg interviewed Trenkamp. She told Kilburg about her work at a hardware store where Remakel had shopped. Kilburg asked Trenkamp what Remakel bought or didn't buy, how he paid for items, and whether the store delivered items. Officer Kilburg included this information in his investigation report.

At a hearing on Mangler's motion for new trial, Trenkamp testified she wasn't sure whether or not she also told Kilburg about her December 23 sighting of Rogge. Here is an excerpt from her testimony:

> Q. Is it possible you didn't tell Josh Kilburg at that time? A. I'm beginning to believe maybe I didn't. Maybe I told him I need to talk to [Mangler's attorney], and somewhere in my brain it stuck that I talked to him and I didn't. I don't know.

Prior to trial, Mangler's counsel subpoenaed Trenkamp. Counsel intended to have Trenkamp testify about Remakel's shopping habits as reflected in Kilburg's report.

When Trenkamp received the subpoena, she did not know what it was for. So she called Officer Kilburg to ask.[10] Kilburg responded it was probably about the hardware store. But Trenkamp said she thought it was about seeing Rogge on December 23. Kilburg did not know what Trenkamp was talking about. So, after they got off of the phone, Kilburg went back through his notes and the audio

---

[10] The record does not pinpoint with certainty when the phone call between Trenkamp and Officer Kilburg occurred.

recording of his interview with Trenkamp. He found no mention of the Rogge sighting. So Kilburg called Trenkamp back. He told her to tell Mangler's defense team what she knew. He also told the prosecutor what Trenkamp said. They assumed Trenkamp would talk to defense counsel before testifying.

As it turned out though, Mangler's counsel chose not to have Trenkamp testify. Nor did counsel interview Trenkamp. So counsel did not learn of Trenkamp's Rogge sighting before or during trial.

After the verdict, a third party contacted counsel and shared Trenkamp's information. Mangler then moved for a new trial based on newly discovered evidence. At a hearing on the motion, Mangler presented testimony from Kilburg, Trenkamp, and two other witnesses. Mangler claimed the "State violated *Brady* when it failed to reveal exculpatory information provided to Officer Kilburg prior to trial that Rogge was walking back and forth in front of Remakel's residence." The court denied Mangler's motion.

Our review is de novo. *State v. Jones*, 817 N.W.2d 11, 15 (Iowa 2012). "To establish a *Brady* violation has occurred," Mangler was required to "prove by a preponderance of the evidence '(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issue of guilt.'" *DeSimone v. State*, 803 N.W.2d 97, 103 (Iowa 2011) (quoting *Harrington v. State*, 659 N.W.2d 509, 516 (Iowa 2003)). It is the prosecutor's duty to disclose exculpatory information, even if the accused has not requested it. *Harrington*, 659 N.W.2d at 522. But "if the defendant either knew or should have known of the essential facts permitting him to take advantage of the evidence, the

evidence is not considered suppressed." *Id.* (internal quotation marks omitted) (citation omitted).

Following our de novo review, we agree with these findings of the district court:

> The court believes that there is little evidence of a *Brady* violation here. It's unclear whether Ms. Trenkamp reported the December 23rd sighting at any time prior to two days before trial. It appears more likely that she did not. . . .
>
> Mr. Rogge's wanderings around town, per the testimony at trial and here today, were common knowledge in Bellevue. The court does not believe that his December 23rd wanderings, even if in the vicinity of Mr. Remakel's residence, would appear exculpatory to Officer Kilburg.
>
> Also, the defense, of course, had subpoenaed Ms. Trenkamp as a witness, they certainly could have interviewed her before trial.
>
> But in any event, Mr. Rogge's activities of December 23rd, four days after the murder, as reported by Ms. Trenkamp and Ms. Merrick, are not material, and it is highly unlikely that this information would have changed the result. In addition, as mentioned, it could have been discovered prior to trial in the exercise of the defense's due diligence.

Like the district court, we find no *Brady* violation occurred.

## III. Conclusion

We affirm Mangler's conviction for second-degree murder.

**AFFIRMED.**