**MERCY HOSPITAL, Appellee,**

v.

**HANSEN, LIND & MEYER, P.C., Appellant.**

No. 88–1111.

Supreme Court of Iowa.

May 23, 1990.

Steven L. Udelhofen of Jones, Hoffman & Huber, Des Moines, for appellant.

David A. Elderkin, David M. Elderkin and Cynthia Hanna Camp of Elderkin & Pirnie, Cedar Rapids, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, SCHULTZ, CARTER and LAVORATO, JJ.

McGIVERIN, Chief Justice.

This matter arises out of the design, construction and repair of certain additions to hospital buildings belonging to plaintiff Mercy Hospital (Mercy) of Cedar Rapids. Defendant Hansen, Lind & Meyer, P.C. (HLM) is the architectural firm which designed the additions and advised Mercy on their repair when the exterior brick walls began to crumble and leak. When it became apparent to Mercy that the design of the additions was faulty and the repair advice bad, Mercy sued HLM and various contractors which worked on the additions.

All defendants except HLM settled with Mercy on the first day of trial. During the trial, HLM objected to certain expert testimony offered by Mercy on damages issues. The objections were overruled.

Mercy's case against HLM was submitted to the jury on theories of negligence and breach of contract ("fault") under the Iowa Comparative Fault Act, Iowa Code chapter 668 (1987), as well as the theory of fraudulent misrepresentation. The jury returned special verdicts for Mercy, apportioning the fault between HLM and the settling defendants on the comparative fault verdict and finding HLM solely liable on the fraudulent misrepresentation verdict. After adjusting the jury's fraudulent misrepresentation award downward to accord with the jury instructions, the court entered judgment on the verdicts with interest from the date the suit was filed.

HLM appealed. We transferred the case to the court of appeals, which reversed and remanded for retrial on the issue of lost profits. The court of appeals also held that the district court erred by assessing prejudgment interest on certain portions of the damages award.

Mercy applied for further review, which we granted. We vacate the decision of the court of appeals, modify the judgment of the district court, and affirm the judgment as modified. The case is remanded for entry of a new judgment consistent with this opinion.

Our review is for correction of errors at law. Iowa R.App.P. 4.

I. *Background facts and proceedings.* HLM was employed by Mercy as architect for the 1969 and 1973 additions to Mercy Hospital in Cedar Rapids. All construction on the additions was completed by 1974.

Between 1979 and 1981, corbels [1] on the first level of the additions developed visible cracks. Cracks also appeared in the exterior brick on the sixth and seventh levels of the additions. Water, bats and wasps entered the hospital. The additions became difficult to heat and cool. Rust appeared on the exterior brick, which began to crumble and chip. HLM was asked to inspect the additions and to give its opinion about the cause of these problems.

By August 1982, HLM had completed its inspection and informed Mercy by letter that "failure of the expansion joint sealant [was] causing the major portion of the problem." HLM stated that the sealant, or caulking, had reached its expected service life and that recaulking would remedy the problem. When Mercy asked who was at fault, HLM replied that it was "obvious that the proper joint depth-to-width ratios were not maintained by the sealant installer" but opined that it would be difficult to prove that fact. HLM denied that there were any design problems with the additions and suggested that the recaulking should be viewed as routine maintenance. A May 1981 internal memorandum at HLM, however, suggests that HLM knew better:

> A corbelled wall situation has progressed to a serious state. Something is going to need to be done about it besides cosmetics. I [John H. Lind] anticipate that it will have a pretty high dollar figure attached to the remedial work.
> *Clifford Green [an HLM engineer] thinks the building was built in accordance with the contract documents which would kind of eliminate [the builders] and point the blame more to design.*

(Emphasis added.)

Mercy took HLM's advice and contracted to have the additions recaulked. Work began in the fall of 1982 and continued through May 1983, when the recaulking contractor and Mercy determined that even the new caulking (the 1982–83 recaulking) was not holding up and that the damage to the exterior brick was more extensive than originally thought. HLM was consulted again and insisted that recaulking was the proper solution to Mercy's problems.

Mercy then began to doubt HLM and so retained two independent architectural/engineering firms to evaluate the situation. After extensive investigation and consultation, these two firms agreed that the problems with the 1969 and 1973 additions were far more serious than HLM had indicated.

---

**1.** A "corbel" is a bracket which projects from the face of a wall and generally is used to support a cornice or an arch. American Heritage Dictionary 323 (2nd college ed. 1985).

By June 1984 the two firms had concluded that the problems stemmed from faulty design and construction of the additions.

On December 24, 1984, Mercy sued HLM and several of the contractors involved in the construction of the additions. Mercy sought damages from HLM on breach of contract, breach of warranty, strict liability in tort, and negligence theories. In addition, Mercy alleged that HLM should be liable for the cost of repairs on a theory of fraudulent misrepresentation. Mercy sought damages from the other defendants on similar theories. All defendants denied liability.

Repair of the additions was begun in August 1985. Eventually it was decided that the entire exterior brick and parts of the supporting structure would have to be replaced to ensure the structural integrity of the additions. The repairs were largely completed by the summer of 1987 at a total construction cost of approximately $2.4 million.

The case proceeded to trial by jury in May 1988. All defendants except HLM settled with Mercy on the first day of trial.

At trial, Mercy presented evidence that its business was disrupted by the condition of the buildings and the repair work. The court allowed Mercy associate administrator Marc Gullickson to state his expert opinion as to the amount of profits Mercy lost during the repair period due to the disruptions of the hospital's business. HLM objected to this testimony on several grounds. Allowance of Gullickson's lost profits testimony is the basis of HLM's first assignment of error on appeal.

The court also allowed Dale Moore, a structural engineer who examined the additions and oversaw their repair, to state his expert opinion as to the diminution in the value of the additions due to certain irreparable conditions allegedly caused by the fault of the defendants. HLM objected to this testimony, and its allowance is the basis of HLM's second assignment of error on appeal.

Mercy's theories of negligence and breach of contract were submitted to the jury as theories of "fault" under the Iowa Comparative Fault Act, Iowa Code chapter 668 (1987). Mercy's fraudulent misrepresentation theory also was submitted to the jury. The jury was instructed that, depending on its findings, it could award up to all of Mercy's damages on the "fault" theories of recovery, but no more than the cost of the 1982–83 recaulking on the fraudulent misrepresentation theory. On appeal, HLM's third assignment of error is based on submission of the cost of the 1982–83 recaulking as an element of damages under any theory.

The jury returned special verdicts for Mercy on the fault theories as well as on the fraudulent misrepresentation theory. Its comparative fault verdict (verdict I) assessed fifty-five percent (55%) of the fault to HLM and forty-five percent (45%) to the settling defendants. The damages awarded on verdict I were:

| | |
|---|---|
| Costs of repair | $2,370,860 |
| Costs accrued prior to repair (cost of the 1982–83 recaulking) | 66,306 |
| Future expenses | 57,650 |
| Lost profits | 688,451 |
| Diminution in value | 0 |
| Incidental expenses | 2,100 |
| TOTAL: | $3,185,367 |

The jury also awarded Mercy damages of $3,185,367 on the fraudulent misrepresentation theory (verdict II). The jury declined to award punitive damages.

HLM's motion for judgment notwithstanding the verdict was overruled. In its judgment entry, however, the district court adjusted verdict II downward to $66,306, which was the maximum actual damages allowable under the jury instructions on Mercy's fraudulent misrepresentation theory. Judgment was entered against HLM for $1,751,951.85 (55% of $3,185,367) on verdict I; and for $66,306 on verdict II. The court also ordered that HLM pay the costs of the action and interest on the total amount of the judgment ($1,818,257.85) from the date the suit was filed.

The court's judgment entry is the basis of HLM's fourth and fifth assignments of error on appeal: fourth, that the court erred by awarding duplicate damages to the extent that it awarded Mercy the cost

of the 1982–83 caulking on both verdict I and verdict II; and fifth, that the court erred by awarding Mercy prejudgment interest on certain portions of the judgment entered.

We transferred HLM's appeal to the court of appeals, which held that the district court erred by allowing Gullickson to offer his opinion as to the profits Mercy allegedly lost during the repair period. The court of appeals also held that the district court erred in its assessment of prejudgment interest. The court of appeals reversed those portions of the judgment of the district court and remanded the case for retrial on the issue of lost profits and for reassessment of prejudgment interest. The judgment of the district court was affirmed on the other errors HLM had assigned on appeal.

We granted Mercy's application for further review.

II. *Whether the district court erred by allowing Gullickson to give his expert opinion about Mercy's lost profits.* At trial, there was evidence that Mercy's business was disrupted by the condition of the additions and the repair work. Over HLM's objections, the district court allowed Mercy associate administrator Marc Gullickson to give his expert opinion as to the amount of profits Mercy lost during the repair period because of the disruptions. HLM maintains that the district court should not have allowed Gullickson to state this opinion because: 1) Gullickson changed the substance of his opinion after his pretrial deposition without notice to HLM; 2) Gullickson was not qualified to give expert testimony on the calculation of profits in the hospital industry; and 3) there was no adequate factual basis for the opinion.

A. HLM's first argument on this issue is based on Iowa Rule of Civil Procedure 125. Subsection (d) of that rule provides, in relevant part:

> To the extent that the facts known, or mental impressions and opinions held, by an expert have been developed in discovery proceedings under ... this rule, the expert's direct testimony at trial may not be inconsistent with or go beyond the fair scope of the expert's testimony in the discovery proceedings....

HLM also notes that Mercy had a continuing obligation to supplement its answers to interrogatories concerning the substance of expert testimony to be offered at trial. *See, e.g., Krugman v. Palmer College of Chiropractic,* 422 N.W.2d 470, 474 (Iowa 1988), *cert. denied,* 488 U.S. 944, 109 S.Ct. 370 (1988); Iowa R.Civ.P. 125(c). The purpose of these rules is to avoid surprise to litigants and to permit issues to become both defined and refined before trial. *See, e.g., Lambert v. Sisters of Mercy Health Corp.,* 369 N.W.2d 417, 422 (Iowa 1985); *White v. Citizens Nat'l Bank of Boone,* 262 N.W.2d 812, 816 (Iowa 1978).

According to HLM, Gullickson's trial testimony as to Mercy's lost profits should have been excluded because it went beyond his deposition testimony on that issue, and HLM was never notified that Gullickson's opinion would differ in any way from that given at his deposition. The district court refused to exclude or limit Gullickson's testimony on this basis. We review this ruling for an abuse of discretion. *See, e.g., Miller v. Bonar,* 337 N.W.2d 523, 527 (Iowa 1983).

The transcript of Gullickson's pretrial deposition was not introduced at trial. Beyond counsel's assertions, the only support for HLM's contention that Gullickson's trial testimony went beyond his deposition testimony is Gullickson's statement on voir dire that his direct testimony at trial included an adjustment to the lost profits calculation that he had not made at his deposition.

At deposition, Gullickson apparently testified that the number of patients admitted to the hospital per month in the two additions dropped during the repair period of July 1985 to the summer of 1987, as compared to the same months in prior years. Gullickson testified that the drop in patients was attributable to the repair work. Applying average revenue and cost figures, Gullickson then attached a dollar figure to the drop in patients and offered this figure as Mercy's lost profits damages.

At trial, Gullickson's opinion on lost profits was adjusted downward by comparing

the drop in patients during the repair period in the additions with the less drastic drop in patients during the same period in areas of the hospital not under repair. Gullickson testified that, in his opinion, the more drastic drop in patients in the additions was caused by the repair work. He then attached a dollar figure to the difference between the drop in patients in the additions and the drop in patients in the areas not under repair. He testified to this figure as Mercy's lost profits damages.

Gullickson presumably made this adjustment to his lost profits opinion to account for weaknesses in his initial opinion which were pointed out on cross-examination at the deposition, namely, that his initial analysis ignored health care industry trends that were causing across-the-board reductions in hospital admissions. According to Gullickson, his trial testimony took the industry trends into account by using the drop in the number of patients in the areas not under repair as a proxy for those trends. In the sense that the need to account for the trends was discussed at the deposition, Gullickson's opinion at trial was within the scope of his testimony as explored in discovery. Although the opposite ruling perhaps could have been made, on this record we cannot say that the district court abused its discretion in allowing Gullickson to testify as he did.

■ B. HLM next argues that Gullickson was not qualified to give an expert opinion on the calculation of profits in the hospital industry. The argument boils down to an assertion that Gullickson was not so qualified because he is not an accountant. We reject this argument. Gullickson testified that he holds a masters degree in hospital administration and has worked as a hospital administrator or consultant continuously since 1974. He has experience in the renovation and construction of hospital facilities, as well as in hospital management. The district court was well within its discretion in allowing Gullickson to give expert testimony about the business aspects of hospital administration, including the calculation of hospital profits. *See, e.g., State ex rel. Leas in the*

*Interest of O'Neal,* 303 N.W.2d 414, 420–21 (Iowa 1981) (discussing our liberal standards for admissibility of expert opinion testimony).

■ C. In a related argument, HLM argues that there was no adequate factual basis for Gullickson's testimony on Mercy's lost profits. On direct examination, Gullickson testified that he had reviewed the financial records and patient activity records of Mercy for the months from August 1983 to the summer of 1987 and beyond. He testified that from this data he had calculated the profits Mercy lost during the repair period. Gullickson also had firsthand knowledge of the course of events at Mercy since he joined the hospital staff in 1983. HLM's complaint is that Mercy did not introduce the books and records Gullickson consulted in formulating his opinion.

Mercy was not obligated to introduce all of its financial and patient activity records as a precondition of Gullickson's testimony. Iowa Rule of Evidence 705 provides that:

> [An] expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Indeed, in some cases an expert may base an opinion on facts or data that are not even admissible. Iowa R.Evid. 703. The effect of these rules is to "place the full burden of exploration of the facts and assumptions underlying the testimony of an expert witness squarely on the shoulders of opposing counsel's cross-examination." *Smith v. Ford Motor Co.,* 626 F.2d 784, 793 (10th Cir.1980) (construing federal rules of evidence 703 and 705, practically identical to their Iowa counterparts) (quoting Graham, *Discovery of Experts Under Rule 26(b)(4) of the Federal Rules of Civil Procedure: Part One, An Analytical Study,* 1976 U.Ill.L.F. 895, 897), *cert. denied,* 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981); *but see Renze Hybrids, Inc. v. Shell Oil Co.,* 418 N.W.2d 634,

639–40 (Iowa 1988) (court may, in its discretion, require prior disclosure of facts or data underlying expert's opinion). If HLM wished to show that Gullickson's opinion was not supported by the facts and data which he stated that he reviewed in formulating the opinion, then HLM should have brought the data out on cross-examination. Having failed to do so, HLM will not now be heard to complain that the facts relied upon by Gullickson were an insufficient basis for his opinion.

HLM also devotes many pages of its brief to attacking Gullickson's opinion as self-serving, lacking specificity, being based on hearsay information and oversimplifying the calculation of profits in the hospital industry. HLM protests that the opinion of its own expert witness was far more credible than Gullickson's opinion. Assuming HLM's assessment of the expert testimony in this case to be accurate, it does not warrant reversal. As one court stated in similar circumstances:

> These orotund arguments were addressed to the jury and that was the proper audience. It was for the jury to decide which of the experts was more credible, which used the more reliable data, and whose opinion—if any—the jury would accept. The jury might credit one or more of the expert opinions or it might reject them all.

*Grenada Steel Indus., Inc. v. Alabama Oxygen Co., Inc.,* 695 F.2d 883, 889 (5th Cir.1983).

The district court did not err by allowing Gullickson to give his expert opinion about Mercy's lost profits.

■ III. *Whether the district court erred by allowing Moore to give his expert opinion about the diminution in the value of the additions.* At trial, Dale Moore was allowed to give his expert opinion as to the diminution in the value of the additions due to certain irreparable conditions allegedly caused by the defendants' fault. HLM argues that it was error to allow Moore, a structural engineer, to give expert testimony on the value of the additions.

We need not consider HLM's arguments on this issue because the jury awarded no damages to Mercy for the alleged diminution in the value of the additions. There also is no suggestion that the jury's award on this or any other element of damages was the result of an impermissible compromise verdict. Although HLM complains that the damages award on verdict II shows that the jury was confused, whatever confusion there was had nothing to do with the liability issues. Error in allowing Moore's testimony, if any, was harmless.

IV. *Whether the district court erred by submitting the cost of recaulking the additions as an element of damages under any theory of liability.* The district court submitted the cost of the 1982–83 recaulking as an allowable element of damages on both verdict I ("Costs accrued prior to repair") and verdict II. HLM argues that this cost was not a proper element of damages under any of Mercy's theories of liability and, therefore, the court erred by submitting it on either verdict form.

In its appellate brief, Mercy does not dispute HLM's assertion that the cost of the 1982–83 recaulking was not a proper element of damages on verdict I. We will assume, for purposes of this opinion, that it was not.

■ Nevertheless, the cost of the 1982–83 recaulking was properly submitted as an element of damages on verdict II. Verdict form II was the form for Mercy's theory of fraudulent misrepresentation. Even assuming that by 1982 the additions should have been recaulked as a matter of routine maintenance regardless of HLM's recommendation, that does not answer Mercy's claim that it undertook the recaulking only because HLM fraudulently misrepresented that recaulking would solve all the problems with the additions. Substantial evidence supported the verdict concerning fraudulent misrepresentation. Thus, Mercy was entitled to recover the money it wasted on recaulking and it was not error to submit the cost of the recaulking as an element of damages on verdict II.

V. *Whether the district court erred in its judgment entry.* The jury returned

special verdicts for Mercy on the fault theories (verdict I) and on the fraudulent misrepresentation theory (verdict II).

On verdict I, fifty-five percent (55%) of the fault was assigned to HLM and forty-five percent (45%) was assigned to the settling defendants. The total damages awarded Mercy on verdict I were $3,185,-367, including $66,306 for the cost of the 1982–83 recaulking. On verdict II, applicable only to HLM, the jury also awarded Mercy $3,185,367.

In its judgment entry, the district court properly reduced the jury's award on verdict II to $66,306, which was the maximum damages allowable under the jury instructions on Mercy's fraudulent misrepresentation theory. The court then entered judgment against HLM for $66,306 (verdict II) plus $1,751,951.85 (55% of verdict I) for a total of $1,818,257.85, interest and costs not included.

■ A. HLM argues that the district court erred by awarding Mercy the cost of the 1982–83 recaulking on both verdict I and verdict II.

As previously noted, in its brief Mercy does not dispute that the cost of the 1982–83 recaulking was not a proper element of damages on verdict I.[2] Had that element not been submitted on verdict I, that verdict would have totalled $3,119,061. Verdict II, as reduced by the court, would have remained at $66,306. Thus, the proper judgment to be entered against HLM is $66,306 (verdict II) plus $1,715,483.55 (55% of $3,119,061) for a total of $1,781,789.55, interest and costs not included.

On remand, the judgment should be corrected accordingly.

B. The judgment entry also ordered HLM to pay Mercy interest on the total amount of the judgment from the date the suit was filed. This award of "prejudgment interest" was made pursuant to Iowa Code section 535.3 (1987) which provides, in relevant part:

Interest shall be allowed on all money due on judgments and decrees of court at the rate of ten percent per year.... *The interest shall accrue from the date of the commencement of the action.*[3]

(Emphasis added.)

■ Notwithstanding the plain language of section 535.3, HLM argues that interest on that portion of the judgment compensating Mercy for repair costs should only accrue from the date the expenditures were made where, as here, they were made at various times between commencement of the action and judgment. HLM further argues that interest on those portions of the judgment compensating Mercy for lost profits and future expenses should be assessed only from the date of judgment. The court of appeals agreed with HLM.

We do not agree that interest on the judgment for repair costs should only accrue from the date the expenditures were made, rather than from the date of commencement of the action. Although the additions had not yet been repaired when this action commenced, the injury to the additions was complete before that time. The defective condition of the additions was becoming apparent as early as 1979

---

2. Even if the cost of the 1982–83 recaulking was a proper element of damages on both verdict I and verdict II, Mercy would not be entitled to recover those damages twice. Mercy concedes that it then could recover the cost on either verdict I or II, but not on both. *See e.g., Team Central, Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 923–36 (Iowa 1978).

3. Iowa Code section 535.3 was amended by 1987 Iowa Acts chapter 157, section 1, so that section 535.3 no longer applies to the award of interest for judgments and decrees subject to Iowa Code section 668.13. *See* Iowa Code § 535.3 (1989). Iowa Code section 668.13, among other things, provides that interest on judgments for "future

damages" in actions brought under the Iowa Comparative Fault Act accrues only from the date of judgment and not from the date of commencement of the action. Iowa Code § 668.13(4) (1989). Although this action, at least in part, is governed by the Iowa Comparative Fault Act, section 668.13 does not apply here because the cause of action accrued prior to July 1, 1987 and was filed prior to September 15, 1987. *See* 1987 Iowa Acts ch. 157, § 11. Thus, the applicable prejudgment interest statute in this case is Iowa Code section 535.3 as it existed prior to the 1987 amendment, that is, Iowa Code section 535.3 (1987).

when their exterior walls began to crumble and leak.

This case is not like *Rowen v. Lemars Mutual Insurance Co. of Iowa,* 347 N.W.2d 630, 641 (Iowa 1984), or *Sedco International, S.A. v. Cory,* 522 F.Supp. 254 (S.D. Iowa 1981), *aff'd,* 683 F.2d 1201 (8th Cir.1982), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982). In both of those cases the court held that the plaintiff was not entitled to interest in advance of injury. In *Lemars* and *Sedco,* however, the injury was to the plaintiff's pocketbook directly, so that until the plaintiff expended money there was no injury; in this case the injury is to the plaintiff's hospital additions. The injury was complete well before money was spent to repair the additions or, in fact, regardless of whether Mercy repaired the additions at all.

█ We also think that the district court correctly assessed interest from the date of commencement of the action on those portions of the judgment compensating Mercy for the profits lost during the repair period. Although these lost profits damages more readily fit into the conceptual package of *Lemars,* they were a consequence of the injury to the additions and were foreseeable at the time of that injury. We decline HLM's invitation to extend the *Lemars* prejudgment interest exclusion to consequential damages arising out of property damage.

█ Finally, we do not agree that the district court erred by assessing interest from the date of commencement of the action on the portion of the judgment compensating Mercy for future expenses to be incurred because of the defendants' fault. Future damages are not excepted from the plain language of section 535.3 as it applies to this case. *See* n. 3, above.

HLM strenuously argues that allowing interest to accrue from the date of commencement of the action on those portions of the judgment compensating Mercy for its lost profits and future expenses is unfair. In the case of lost profits, Mercy will receive prejudgment interest on money to which it had no claim of right at the commencement of the action; in the case of future expenses, Mercy will receive prejudgment interest on money which it has not yet spent. Notwithstanding these complaints, we are bound to respect the plain language of Iowa Code section 535.3. Perhaps it is only rough justice, but application of the statute's plain language will nevertheless further its goal of preventing persons rightfully obligated to pay money to another from profiting through delays in litigation. *See In re the Marriage of Baculis,* 430 N.W.2d 399, 401 (Iowa 1988).

We have considered the other points raised by HLM and find them to be without merit.

VI. *Disposition.* The decision of the court of appeals is vacated. The judgment of the district court is affirmed as modified. The case is remanded for entry of a new judgment consistent with this opinion.

Costs shall be taxed to HLM.

DECISION OF THE COURT OF APPEALS VACATED; JUDGMENT OF THE DISTRICT COURT AFFIRMED AS MODIFIED; CASE REMANDED.