# IN THE COURT OF APPEALS OF IOWA

No. 22-2048
Filed May 8, 2024

**FATIMA E. BELHAK and ABDELLATIF ELFILA,**
    Plaintiffs-Appellees,

**vs.**

**DENICE SMITH, M.D., and WOMEN'S CARE SPECIALISTS, P.C.,**
    Defendants-Appellants.
_____

Appeal from the Iowa District Court for Scott County, Jeffrey D. Bert, Judge.

A doctor and her employer appeal a jury verdict finding them liable for medical malpractice. **REVERSED AND REMANDED.**

Troy L. Booher and Beth E. Kennedy of Zimmerman Booher, Salt Lake City, Utah, and Nancy J. Penner of Shuttleworth & Ingersoll, P.C., Cedar Rapids, for appellants.

Anthony J. Bribriesco and William J. Bribriesco of Bribriesco Law Firm, PLLC, Bettendorf, for appellees.

Heard by Bower, C.J., and Badding and Langholz, JJ.

**LANGHOLZ, Judge.**

Fatima Belhak and her husband sued her doctor, Denice Smith, and the doctor's employer for medical malpractice over the care that she received following an episiotomy performed during the birth of her first child.[1] The court instructed the jury on three alternative specifications of negligence. And the jury returned a general verdict that Smith was negligent and her negligence caused damages to Belhak—awarding $3.25 million in damages.

Smith seeks a new trial, arguing that the court should not have submitted one of the specifications of negligence—that Smith used the wrong size of sutures—to the jury because Belhak had failed to present any expert evidence supporting causation for that theory. She also argues that a new trial is warranted because Belhak's counsel made improper statements in closing argument and asked more than fifty improper leading questions throughout the trial.

Because Belhak's expert did not testify that the use of smaller sutures was more likely than not a cause of Belhak's harm, that specification should not have been submitted to the jury. And Smith properly preserved error on this issue by moving for a directed verdict and raising it again in her posttrial motion for a new trial. It matters not that she agreed to the jury instruction. So she is entitled to a new trial on this basis alone, and we need not address whether the conduct of Belhak's counsel would also warrant a new trial. We thus reverse and remand to the district court for a new trial.

---

[1] Because the arguments on appeal do not vary between the coplaintiffs and codefendants, we will generally refer only to Belhak and Smith for simplicity. But both defendants appealed the verdict against them and both plaintiffs were awarded damages and have participated in the appeal as the appellees.

I.

Belhak and her husband, Abdellatif Elfila, welcomed their first child in January 2014. Belhak's regular obstetrician with Women's Care Specialists was unavailable when she went into labor, so Smith covered the delivery. As the baby's head began crowning, Smith decided she needed to perform an episiotomy because Belhak's skin around her vagina was "very tight around the baby's head," impeding the baby's outward progress. To perform an episiotomy, a doctor makes a small incision with a special pair of scissors from the vagina into the mother's perineum—the area between the vagina and the anus. After performing the episiotomy, the baby was successfully delivered without issue. And there appears to be little dispute about the need for the episiotomy or the way it was performed. The parties' dispute starts with what happened next.

After the birth, Smith conducted a vaginal examination, which included checking out the episiotomy incision to see how far it went and how deep it went towards the anus and rectum. Smith diagnosed a second-degree laceration with an extension up into the vaginal area. And Smith repaired the laceration with 4-0 vicryl sutures—the suture she "typically" used for vaginal laceration repairs—rather than larger 3-0 or 2-0 sutures. Smith did not perform a rectal exam. And she did not diagnose that Belhak had a fourth-degree laceration—an extension of the laceration into the lining of the rectum.

While still in the hospital, Belhak felt pain in her rectum and noticed small pieces of stool and blood on her postpartum pad after birth. She reported this to her medical providers. After a nurse conducted a visual examination and saw nothing out of the ordinary, the nurse gave her an ice pack to ease the pain.

Belhak went home.  And a few days later, she self-inspected her vaginal area.  She was still in pain and saw stool coming from her vagina.  After calling Smith and her regular medical provider, she went to the emergency room, which sent her to the University of Iowa Hospitals and Clinics.  The University doctors diagnosed Belhak with a fourth-degree laceration.  They also diagnosed a rectovaginal fistula—essentially a hole between the rectum and the vagina that allowed stool and gas to pass from the rectum to the vagina and then come out of Belhak's body either or both ways.  Because the area became infected—as typically happens if not repaired within twenty-four hours of the injury—Belhak had to wait about five months to repair the injuries with reconstructive surgery.

From February until the reconstructive surgery in June, Belhak had to bathe for thirty minutes in a sitz bath after every bowel movement to disinfect the wound. Even after her reconstructive surgery, she suffers pain.  She has trouble walking, carrying heavy objects, and sitting or sleeping in certain positions.  Sometimes this pain radiates from her pelvis down her legs.  She does physical therapy and at-home exercises to alleviate the pain as much as possible.  She cannot be around other people too long for fear of uncontrollable bowel movements and gas, and she has to restrict her diet to avoid accidents.  Her relationship with her husband has struggled because of her injury.  And he has taken on more responsibilities in raising their children, caring for Belhak, taking her to appointments, and helping her with therapy.

In 2016, Belhak and her husband sued Smith and Smith's employer over her care following the episiotomy.[2] Belhak claimed that Smith's care was medical malpractice that caused her physical and mental injury and pain and suffering. And her husband claimed loss of consortium.

The case was eventually tried to a jury in March 2022—after the first attempt a couple of years earlier ended with a mistrial during jury selection. Over seven days, the jury heard from Belhak and her husband, Belhak's original obstetrician who could not make the birth, and Smith. The jury also heard from two competing expert witnesses—one testifying for Belhak and the other for Smith. Belhak's expert was Dr. Gregory Chen, an experienced obstetrician and gynecologist who also served on the clinical faculty of Northwestern University.

After the close of Belhak's case, Smith moved for a direct verdict on the specification of negligence that Smith used the wrong size of sutures, arguing that "there has not been any testimony that the use of 4-0 vicryl sutures caused any of the injuries to the plaintiffs."[3] The court denied the motion, reasoning that Smith "has put forth sufficient evidence on both of those issues to make this a jury question."

The court then submitted the case to the jury with a marshaling instruction that included three specifications of negligence, instructing that "[t]he plaintiffs must prove" that Smith was "negligent in one or more of the following ways:"

---

[2] Belhak originally filed two suits—one against Smith and a second against Smith's employer, Women's Care Specialists. The cases were consolidated together with all filings after consolidation made in the case originally brought only against Women's Care Specialists.

[3] Smith also made a second motion for directed verdict applicable to all the specifications of negligence that is not at issue on appeal.

(1) "by failing to perform a rectal examination after an episiotomy; or" (2) "by failing to recognize a fourth-degree laceration; or" (3) "by using 4-0 Vicryl sutures to repair the episiotomy." Smith agreed that the second and third specifications "should be submitted." But she argued that the first specification—and others the court decided not to submit—were "duplicative" and "unduly emphasized plaintiffs' case."

The jury found that Smith was negligent and her negligence caused damages to Belhak.[4] And the jury awarded $3.25 million in damages. The verdict form did not require the jury to specify which of the three specifications of negligence were proved.

Smith moved for a new trial for a host of reasons. Among other arguments not relevant to this appeal, she again argued that the suture specification of negligence should not have been submitted to the jury because there was insufficient evidence of causation. Smith also argued that Belhak's counsel made at least six arguments during closing argument that constituted misconduct and prejudiced Smith. And she argued that Belhak's counsel's repeated use of leading questions during the trial—over fifty in total that Smith successfully objected to— was also prejudicial misconduct because "the jury was left with the impression that defense counsel was attempting to withhold relevant evidence from its consideration by having to make repeated objections."

The court denied Smith's motion. The court held that Smith had failed "to preserve error" on her argument that the suture specification should not have been

---

[4] While the verdict form mentioned only Smith, the parties agreed that her employer was also liable for any verdict.

submitted to the jury, reasoning that "[w]hile another objection to preserve error is unnecessary, a party cannot agree to specification, only to later argue it was given in error." Alternatively, the court concluded that "a review of the record shows sufficient evidence regarding harm to Fatima Belhak to allow the jury to decide causation without speculation," pointing mostly to evidence of the many harms Belhak has suffered since the episiotomy.

On Smith's claims of misconduct during closing argument, the court agreed that Belhak's counsel engaged in three instances of misconduct. But the court concluded that these improper arguments—standing alone or collectively—did not warrant a new trial. The court reasoned that it had given curative instructions to the jury, Belhak's "evidence could be characterized as strong," and "[n]one of the alleged misconduct surrounded [the] central factual dispute." The court also rejected Smith's argument based on Belhak's counsel's leading questions during trial, explaining that it was "not convinced the questioning by [Belhak's] counsel was part of a concerted plan to require defense counsel to object" and that "not all of defense counsel's objections were sustained." Smith now appeals.[5]

---

[5] The parties' appellate filings suggest some confusion about whether Smith has been dismissed from this appeal by the supreme court. So to be clear, both Smith and her employer—Women's Care Specialists, P.C.—properly appealed the verdict against them and remain as appellants. Because the appellants at first attempted to appeal from both the consolidated district court proceeding—in which the verdict was entered—and the dormant case that had been originally filed against Smith alone, our supreme court dismissed the appeal from the dormant case for lack of jurisdiction. And the supreme court also dismissed a second independent appeal that Smith then filed—again from the dormant case—for lack of jurisdiction. *See Belhak v. Smith*, No. 23-0246 (April 14, 2023). But the court never dismissed Smith from the appeal. Indeed, it noted as much in the second dismissal, stating that Smith "is pursuing an appeal in appeal number 22-2048, which was taken from Scott County case number LACE127225, within which all the proceedings below had been consolidated."

II.

As with any claim, to submit a particular theory of negligence—often called a specification of negligence—to the jury, there must be substantial evidence in the record supporting the specification. *See Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 (Iowa 2016). For a medical malpractice specification, that means evidence that establishes "the applicable standard of care, a violation of that standard, and a causal relationship between the violation and the injury." *Susie v. Fam. Health Care of Siouxland, P.L.C.*, 942 N.W.2d 333, 337 (Iowa 2020). And when multiple specifications are submitted to the jury and "[t]he jury return[s] a general verdict without specifying which" specifications the plaintiff proved, "[a] new trial is required . . . if the evidence was insufficient to submit one of" them. *Alcala*, 880 N.W.2d at 710. We review the decision to submit a specification to the jury for correction of errors at law. *Id*. at 707–08.

Smith argues that a new trial is required because Belhak failed to present sufficient evidence of causation for one of her three specifications of negligence— that Smith used sutures that were too small for the repair of Belhak's episiotomy. But before we can reach the merits of that argument, we must decide whether Smith has preserved error for our consideration of this issue on appeal. Belhak contends that Smith did not because Smith agreed to the jury instruction containing the suture specification and did not adequately argue the issue in her posttrial motion for a new trial. We disagree.

"It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). Moving for a

directed verdict on a specification of negligence is a proper way to raise the issue that a plaintiff has introduced insufficient evidence supporting the specification. *See James ex rel. James v. Burlington N., Inc.*, 587 N.W.2d 462, 464 (Iowa 1998). And when the district court denies a directed verdict, the party need not object again to the jury instruction submitting the specification to the jury. *See id.* Indeed, this has been the rule in Iowa for nearly a century. *See Heavilin v. Wendell*, 241 N.W. 654, 658 (Iowa 1932) ("[T]o the end that there may be no misunderstanding about this matter, we now fix the ruling to be that, where a party makes a motion for a directed verdict and the court overrules the same, the person against whom such ruling is made does not waive the error, if there is one, in the court's ruling on a motion to direct a verdict by asking instructions which correctly state the law of the case as fixed by the court's ruling on the motion to direct a verdict.").

Smith urged the district court that Belhak had failed to submit sufficient evidence of causation on her suture specification in her directed verdict and again in her posttrial motion for a new trial. Yet when the court considered the jury instructions—mere moments after considering her argument and denying the directed verdict—Smith did not again contest including the suture specification in the marshalling instruction. Rather, she agreed it "should be submitted," and instead challenged other specifications as "duplicative" and "unduly emphasiz[ing] plaintiffs' case." Consistent with our century of precedent, Smith preserved error and was not required to again remind the district court that she still disagreed with its decision that there was enough evidence to submit the specification to the jury.

Belhak tries to distinguish that precedent because Smith agreed to the jury instruction rather than merely failing to object to it. But that is a distinction without

a difference. We see little daylight between the lack of an objection—which is functionally agreement—and Smith's statement of agreement. And the precedent establishes no such distinction—making clear that there is no waiver from "agreeing to jury instructions," *Holdsworth v. Nissly*, 520 N.W.2d 332, 335 (Iowa Ct. App. 1994), or even "asking [for] instructions," *Heavilin*, 241 N.W. at 657, just the same as failing to "object to the instructions," *James*, 587 N.W.2d at 464. What's more, we see nothing in Smith's challenge to other specifications on other grounds that could "be taken as an abandonment of [her] clear position that, as a matter of law, the [specification] should not have been submitted to the jury at all." *Id.*

Belhak also contends that Smith did not properly raise the issue again in her posttrial motion for a new trial. But Smith had a three-page section of her new-trial brief devoted to arguing that the district court "erred denying Defendants' directed verdict motion relating to the use of sutures to repair [Belhak's] laceration" and in "submitting a specification of negligence instruction regarding the size of suture used because that specification required the jury to speculate as to causation." While Belhak makes much of the reference to submission of the specification instruction, this is just another way to say the same thing Smith argued in the directed verdict motion and now on appeal—that Belhak introduced insufficient evidence on causation to support a jury verdict on the suture specification. And the court ruled on Smith's argument, rejecting it both on the merits and because the court found it had been waived by failing to object to the instruction too. Because the issue was raised in and decided by the district court, it was preserved. So we go to the merits.

Causation is a necessary element of a medical malpractice claim. *See Susie*, 942 N.W.2d at 337. This will typically require expert testimony to create a jury question because "a plaintiff needs expert testimony to prove causation unless the causation is so obvious that it is within the common knowledge and experience of a layperson." *Doe v. Cent. Iowa Health Sys.*, 766 N.W.2d 787, 794 (Iowa 2009). *Compare Stickleman v. Synhorst*, 52 N.W.2d 504, 507 (Iowa 1952) (holding that no expert testimony was required on causation where evidence showed that patient began bleeding profusely from the neck after doctor inserted needle into the throat, apparently missing the intended mark and hitting a blood vessel), *with Bradshaw v. Iowa Methodist Hosp.*, 101 N.W.2d 167, 171 (Iowa 1960) (holding that plaintiff failed to prove causation without expert testimony that his back injury was caused by fall in the hospital rather than a previous workplace injury).

While the evidence "need not be conclusive," it "must show the plaintiff's theory of causation is reasonably probable—not merely possible, and more probable than any other hypothesis based on such evidence." *Doe*, 766 N.W.2d at 793 (cleaned up). If the evidence before the jury does not meet this standard, then there is not substantial evidence supporting submitting the claim to the jury. *See id.* at 792–95; *see also Susie*, 942 N.W.2d at 337–340. "The jury cannot be left to speculate about the but-for causal link." *Susie*, 942 N.W.2d at 338–39.

Smith challenges the causation evidence of only one of Belhak's specifications of negligence—that Smith was negligent "by using 4-0 Vicryl sutures to repair the episiotomy" rather than larger 3-0 sutures. And to be clear, Smith only challenges the causation link for this specification. She does not challenge that Belhak presented expert testimony that using smaller 4-0 sutures violates the

standard of care for repairing an episiotomy.[6]  Nor does she challenge that Belhak presented evidence that Belhak and her husband suffered physical and emotional injuries after the episiotomy.  The narrow question is the causal link between the two—whether the use of smaller 4-0 suture was the cause of any of Belhak's claimed harm.

Because the answer is not "so obvious that it is within the common knowledge and experience of a layperson," Belhak needed to provide expert testimony that the smaller suture was a reasonably probable cause of the harm. *Doe*, 766 N.W.2d at 794.  And Belhak does not argue otherwise.  We thus focus on the testimony of Belhak's expert witness, Dr. Chen, to see whether it provides the jury a basis to find the required causal link without speculation.  *See Susie*, 942 N.W.2d at 338–39.[7]

Belhak first points us to a general conclusion that Dr. Chen offered at the opening of his testimony.  He was asked, "And we are going to get into more details later, but as a result of Dr. Smith's breaches of the standard of care, were they a cause of permanent harm to Fatima Belhak?"  And Dr. Chen answered, "Yes."  But

---

[6] Of course, this does not mean that Smith agrees that using 4-0 sutures violates the standard of care—her own expert witness provided a contrary opinion.

[7] Again, the issue before us is whether Dr. Chen's testimony provides "substantial evidence support[ing] the submission of the causal relationship between" Smith's use of the smaller sutures and Belhak's injury.  *Doe*, 766 N.W.2d at 792.  It is not—as Belhak frames it in her brief—whether "Dr. Chen's expert opinions are supported by the record."  So Belhak is wrong to try to shift the burden for developing the causation record onto Smith based on cases challenging the admissibility of an expert's opinion.  *See Mercy Hosp. v. Hansen, Lind & Meyer, P.C.*, 456 N.W.2d 666, 671 (Iowa 1990).  The burden of presenting substantial evidence on all required elements of a plaintiff's claim—so that it may be submitted to the jury—remains at all times on the plaintiff.  *See Doe*, 766 N.W.2d at 792–93; *see also* Iowa R. Civ. P. 1.945 (authorizing motion for directed verdict "[a]fter a party has rested," and "no right to relief has been shown, under the law or facts.").

this alone—without any explanation about what standards of care Dr. Chen was referring to or how any particular breach caused harm—does not move a jury out of speculative territory. And it is apparent from this introductory comment that Belhak's counsel as well understood that "more details" were needed and expected to come to give a basis for the conclusion.

Dr. Chen then provided those added details for the causation of Belhak's other theories of negligence aside from the suture size. He opined that Smith's failure to conduct a rectal examination or to recognize a fourth-degree laceration caused a multi-month delay in properly repairing the episiotomy. And he explained that this delay resulted in harms—both while waiting for treatment and permanently. But when it came time to testify about the 4-0 sutures, Dr. Chen was asked little about the causal link between the 4-0 sutures and Belhak's harm. And what he did say does not provide the required support to find that link.

True, in explaining his opinion that using 4-0 sutures violates the standard of care, Dr. Chen said that he thought using those smaller sutures "would increase the risk of the wound breaking down or not have enough strength to hold it together." But he did not testify that Belhak's sutures did not actually hold together or that her wound broke down because of the sutures.

Much of Dr. Chen's testimony focused on interpreting medical records from the University of Iowa Hospitals and Clinics when Belhak was treated there by specialists who diagnosed her with the fourth-degree laceration and observed the status of Smith's original repair with the 4-0 sutures. Belhak did not call those specialists to testify directly, so the medical records and Dr. Chen's interpretation of them were the only evidence of their conclusions. One note in those records

said that the "vaginal repair site appears broken down."  When asked what this note means, Dr. Chen answered, "It's hard to say, exactly.  From what my guess is, they are seeing an opening either in the perineum or in the vagina or both." Belhak's counsel then pressed Dr. Chen further.  And because this exchange is key to understanding our resolution of the case, we quote it in full:

> Q. When you are looking at this record, what does it mean to you?  A. So broken down means they may see some intact stitches, but you will see tissue that is not sutured, but appears to be separated.
> Q. And so, you said, "appears to be separated," so— A. Correct, whether it's a millimeter separated or fa[r]ther, just not touching each other like they should be; that there is still a defect, I guess, for lack of a better term.
> Q. Within a reasonable degree of medical certainty, that being more likely true than not, was Dr. Smith's breach of the 4-0 sutures that she used a cause of the vaginal repair site breaking down? A. My interpretation, also, they may think it was broken down, meaning they assume, for example, a fourth degree was repaired, and they see a defect in the perineum and don't see sutures there, so they are assuming some of the sutures were dissolved versus it not being repaired at all.
> Q. Sure.  So you can't tell whether—which circumstance, but you know that whatever sutures that this medical provider is looking at has been broken down?  A. Some of the suture, yes.

After starting to ask another follow-up, Belhak's counsel then instead moved on to covering other topics.

It is tough to know what Dr. Chen was trying to say during this exchange. His answer as to whether the use of 4-0 sutures was "a cause of the vaginal repair site breaking down" was particularly "cryptic" and "confusing."  *Susie,* 942 N.W.2d at 338.  And he never agreed that the 4-0 sutures were likely the cause of anything—the breakdown of the repair site or otherwise.  Indeed, from the exchange it is not clear that he even agreed it is more likely than not that the observed breakdown was of the 4-0 sutures rather than just the fourth-degree

laceration that he believed Smith had missed diagnosing—which, again, was one of the alternative specifications of negligence not challenged here. This testimony thus improperly left the jury to speculate about the but-for causal link. *See id.* at 338–39.

But there is another problem. Even if Dr. Chen had answered the question and agreed that the 4-0 sutures caused a breakdown at the repair site, that testimony still would not have completed the causal link between the sutures and Belhak's harm. Dr. Chen was never asked—and thus never explained—whether any breakdown in the repair site caused by the sutures in turn caused Belhak harm. Unlike his testimony on the other alleged acts of negligence, he never opined that the use of the sutures caused the multi-month delay in properly repairing the episiotomy or the related concrete harms from that delay. For example, he never opined that the sutures likely caused the fourth-degree laceration or that they likely made any harm Belhak suffered worse. So any attempt to complete that last causal link would require improper speculation by the jury too. *See id.* at 338–39.

Without any evidence from which a jury could conclude that Smith's use of smaller sutures was a cause of Belhak's injury, it was error for the district court to submit the suture specification of negligence to the jury. And because the general verdict does not tell us which of the specifications the jury found to be proven, Smith is entitled to a new trial. We thus reverse the district court judgment and remand this case for a new trial consistent with this opinion.

III.

Because a new trial is required due to the improper submission of the suture specification, we need not decide whether the conduct of Belhak's attorney during

closing arguments also warrants a new trial. But since the new trial will again require the parties' counsel to engage in proper closing arguments, we find it appropriate to offer some guidance to prevent these issues from arising again.

The district court concluded that Belhak's counsel engaged in three instances of misconduct during closing arguments. Belhak's counsel improperly attacked defense counsel by accusing him of "character assassination" of Belhak during defense counsel's questioning of Dr. Chen. He improperly attacked the defense's expert witness by suggesting—without any basis in evidence—that the expert had violated his Hippocratic oath when performing episiotomies in Honduras. And he improperly mischaracterized Belhak's medical records from the University of Iowa Hospitals and Clinics by saying, "The University of Iowa said that the fourth-degree laceration was there at the time of delivery," when that conclusion is nowhere in the records or any other trial evidence.

"Attorneys have a duty to refrain from crossing the admittedly hazy line between zealous advocacy and misconduct." *Kinseth v. Weil-McLain*, 913 N.W.2d 55, 73 (Iowa 2018). And our decision not to decide whether this conduct would independently warrant a new trial should not be interpreted as any disagreement with the district court's well-reasoned conclusions that this conduct by Belhak's counsel crossed that line.

"When attorneys approach the jury box to present their closing arguments, they carry with them an immense responsibility." *Id.* While "[w]e presume juries follow [their] instruction and do not consider closing statements to be evidence," we recognize that they "will inevitably take [their] cues from attorneys during their respective closing arguments." *Id.* And so, "we observe a heightened sensitivity

to inflammatory rhetoric and improper statements, which may impress upon the jury that it can look beyond the facts and law to resolve the case." *Id.* Engaging in unwarranted personal attacks against opposing counsel and the opposing party's expert witness and misstating key evidence are violations of this responsibility we entrust to Iowa attorneys as officers of the court.

Of course, "attorneys may occasionally make one or more isolated missteps during closing arguments," particularly in the heat of zealous advocacy. *Id.* But we caution that "repeated" and "deliberate" misconduct is another matter entirely— more likely to require a new trial. *Id.* And so, Belhak's counsel would be wise to take care that his misconduct does not repeat.

**REVERSED AND REMANDED.**